IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| MONDIS TECHNOLOGY, LTD., <br> Plaintiff, <br><br> v. <br><br> LG ELECTRONICS, INC., ET AL, <br> Defendants. | § § § § § § § § § § | <br><br><br><br> CIVIL ACTION NO. 2:07-CV-565-TJW-CE |
| ——————————————— | § § § § § § § § § § § § | **Consolidated with:** <br><br><br><br><br> CIVIL ACTION NO. 2:08-CV-478-TJW |
| MONDIS TECHNOLOGY, LTD., <br> Plaintiff, <br><br> v. <br><br> TOP VICTORY ELECTRONICS (TAIWAN) CO. LTD., <br> Defendant. | | |

**MEMORANDUM OPINION AND ORDER**

Before the Court are Defendant TPV's *Daubert* Motion to Exclude Dr. Magee (Dkt. No. 404),[1] Defendant Hon Hai's *Daubert* Motion to Exclude Dr. Magee (Dkt. No. 398), and Defendant InnoLux's *Daubert* Motion to Exclude Dr. Magee (Dkt. No. 389). The Court has carefully considered the parties' submissions, the record, and the applicable law. For the following reasons, the Motions are GRANTED-in-part and DENIED-in-part.

---

[1] TPV informed the Court today that it has reached a settlement with Plaintiff. In view of that announcement, TPV's motion is denied as moot.

## I.  BACKGROUND AND PROCEDURAL POSTURE

The Plaintiff, Mondis Technology Ltd. ("Mondis"), seeks damages for patent infringement of its various patents against the defendants. The defendants in this case can be placed in two groups, "Hon Hai," and "InnoLux."[2] The accused products in this case include monitors and a small number of televisions made by the defendants.

Mondis's damages expert is Dr. Stephen P. Magee. Both defendants have filed separate *Daubert* Motions to exclude the report and testimony of Dr. Magee. The motions are filed separately and the arguments by each defendant are slightly different. Nevertheless, the essential arguments by each defendant can be broken down into three parts: (1) Dr. Magee cannot use the "entire market value rule"; (2) Dr. Magee cannot triple the "standard" royalty to account for uncertainty; and (3) various licenses are neither comparable nor reliable. Each of these issues is discussed below.

## II.  LEGAL STANDARD

The trial court acts as a "gatekeeper" to exclude expert testimony that does not meet the relevancy and reliability threshold requirements. In this role, the trial court determines the admissibility of expert testimony based on Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Accordingly, opinion testimony is not admissible unless: (1) the witness is qualified "as an expert by knowledge, skill, experience, training, or education," Fed. R. Evid. 702; (2) the witness' reasoning or methodology underlying the opinion testimony is scientifically reliable, *Daubert*, 509 U.S. at 592-93; and (3) the

---

[2] Before TPV reached a settlement, there were three groups, including "TPV."

testimony is relevant—that is, it must assist the trier of fact to understand the evidence or to determine a fact at issue. Fed. R. Evid. 702; *Daubert*, 509 U.S. at 591.

To satisfy the reliability prong of *Daubert*, an expert's opinion testimony must be based upon "sufficient facts or data" and must be "the product of reliable principles and methods" that are "reliably" applied "to the facts of the case." Fed. R. Evid. 702 & advisory committee note. When evaluating the reliability of the proffered testimony of an expert, "Rule 702 demands that expert testimony relate to scientific, technical or other specialized knowledge, which does not include unsubstantiated speculation and subjective beliefs." *Diviero v. Uniroyal Goodrich Tire Co.,* 114 F.3d 851, 853 (9th Cir. 1997) (citing *Daubert*, 509 U.S. at 590). "The reliability analysis applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, and the link between the facts and the conclusion." *Knight v. Kirby Inland Marine, Inc.*, 482 F.3d 347, 355 (5th Cir. 2007) (quoting *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 155 (3d Cir. 1999)). "But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert." *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). However, "[w]hen the methodology is sound, and the evidence relied upon sufficiently related to the case at hand, disputes about the degree of relevance or accuracy (above this minimum threshold) may go to the testimony's weight, but not its admissibility." *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 852 (Fed. Cir. 2010). That is, a trial court is not permitted under *Daubert* to "transform a *Daubert* hearing into a trial on the merits." *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 250 (5th Cir. 2002).

**III. DISCUSSION**

*A. Entire Market Value Rule*

The Court holds that under the facts of this case, Dr. Magee may use the entire market value of the accused products in calculating the reasonable royalty because it is economically justified. "The entire market value rule allows for the recovery of damages based on the value of an entire apparatus containing several features, when the feature patented constitutes the basis for the customer demand." *TWM Mfg. Co. v. Dura Corp.*, 789 F.2d 895, 901 (Fed. Cir. 1986). The defendants argue that Dr. Magee cannot apply the "entire market value rule" in this case because the patented feature of the accused product has not been shown to provide the basis for the customer demand. Indeed, the fact that the patented feature does not provide the basis for the customer demand is largely undisputed. (*See* Magee Depo, attached as Ex. A to Dkt. No. 404, at 36:5-36:7.) Mondis, however, argues Dr. Magee is correct in calculating the reasonable royalty based on the entire market value of the accused products because that is the industry standard and because nearly every comparable license in this case is based on a percentage of the total accused product (or licensed product) sales price.

The Federal Circuit has recently stated that "[i]n one sense," the law is clear that "[f]or the entire market value rule to apply, the patentee must prove that the patent-related feature is the basis for the customer demand." *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1336 (Fed. Cir. 2009) (internal quotes omitted). On the other hand, the Federal Circuit in *Lucent* later stated:

> Although our law states certain mandatory conditions for applying the entire market value rule, courts must nevertheless be cognizant of a fundamental relationship between the entire market value rule and the calculation of a running royalty damages award. Simply put, the base used in a running royalty

4

> calculation can always be the value of the entire commercial embodiment, as long as the magnitude of the rate is within an acceptable range (as determined by the evidence).

*Id.* at 1338-39. Further, the Federal Circuit stated "even when the patented invention is a small component of a much larger commercial product, awarding a reasonable royalty based on either sale price or number of units sold can be *economically justified*." *Id.* at 1339 (emphasis added).

This is a case where it is "economically justified" to base the reasonable royalty on the market value of the entire accused product. Dr. Magee opines that a "standard reasonable royalty" rate in this case should be 1% for monitors or 0.25% for televisions, and the royalty rate should be applied to a base that includes the entire market value of the products (i.e., monitors or televisions).[3] Although some of the defendants in this case argue Dr. Magee cannot use the "entire market value rule," ironically, both defendant groups base their royalty analysis on the entire value of the accused products.[4] This is because there are between 13 and 16 comparable licenses (depending on which party is arguing) to the patents-in-suit that provide for a royalty based on the entire value of the licensed products. Dr. Magee largely bases his opinion on these comparable licenses, and at least one defendant, Hon Hai, "does not dispute Dr. Magee's opinion" in this regard. (Dkt. No. 398, at 3.) Further, the defendants' experts' opinions are

---

[3] Dr. Magee ultimately opines that the rates of 1% and 0.25% should tripled. That is a different issue, however, and the Court will address the entire market value issue before addressing the "tripling" issue. Whether Dr. Magee can use the entire value of the accused product as the base for his reasonable royalty analysis is a separate issue than whether Dr. Magee can later triple the royalty rate to account for "uncertainty." Indeed, all parties treat these issues separately in their briefs, and the Court separates them here in order to keep the issues clear.

[4] Richard L. Donaldson, InnoLux's damages expert, argues for an "established royalty rate" and states that the "appropriate royalty base is the sale of unlicensed accused monitors and TVs in the United States" and that this "'customary' rate is 1% of revenue for monitors and 0.25% for TVs." (Dkt. No. 389-11, at 14, 16.) In Hon Hai's brief, Hon Hai plainly states that it "does not dispute Dr. Magee's opinion that 15 of these 16 agreements establish a standard rate of 1% of sales for computer monitors and 0.25% of sales for TVs." (Dkt. No. 398, at 3.)

based, at least in a large part, on these licenses. This is likely because the Federal Circuit has repeatedly emphasized the importance of such licenses in the reasonable royalty analysis. *See, e.g.*, *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d. 860, 869-873 (Fed. Cir. 2010).

Despite Defendants' damages positions that rely on the entire market value of the accused products, Defendants appear to argue that *Plaintiff* cannot, under current Federal Circuit jurisprudence, use the "entire market value rule" unless Plaintiff proves the patented features provide the basis for the customer demand. *See Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1318 (Fed. Cir. 2011) ("The entire market value rule allows a patentee to assess damages based on the entire market value of the accused product *only* where the patented feature creates the basis for the customer demand or substantially creates the value of the component parts.") (emphasis added). If this rule were absolute, then it would put Plaintiff in a tough position because on one hand, the patented feature does not provide the basis for the customer demand, but on the other hand, the most reliable licenses are based on the entire value of the licensed products. If Plaintiff cannot use the entire market value of the accused products, then Plaintiff would have to apportion the accused product and would have two choices regarding the use of the 13 comparable licenses of the patents-in-suit. First, Plaintiff's expert could speculate as to how the licensed parties would have apportioned the patented feature in those licensed products, and then Plaintiff could derive a new royalty rate based on the apportioned part. This choice is undesirable, however, because this would be largely speculative and the previously comparable licenses would suddenly become non-comparable. Alternatively, Plaintiff could choose not to rely on the 13 licenses of the patents-in-suit and instead base its damages model on some other evidence. This option is also undesirable because the licenses of the patents-in-suit, at least

under Federal Circuit jurisprudence, are potentially the most reliable evidence in this case in computing a reasonable royalty.  *See, e.g.*, *ResQNet.com.*, 594 F.3d. at 869-873.

Under the facts in this case, Plaintiff may base its reasonable royalty analysis on the entire value of the accused products, despite not showing the accused features provide the basis of the customer demand.  In this Court's view, Federal Circuit jurisprudence regarding the "entire market value rule" allows for this result, and further, Federal Circuit damages jurisprudence encourages this result by placing a large emphasis on comparable licenses of the patents-in-suit.  To illustrate, the Federal Circuit in *Lucent* stated that "even when the patented invention is a small component of a much larger commercial product, awarding a reasonable royalty based on either sale price or number of units sold can be economically justified." *Lucent*, 580 F.3d at 1339.  As described above, this is a case where it is "economically justified."  And, in addition, this case is not akin to *Uniloc*.  In *Uniloc*, the Federal Circuit rejected an argument by Uniloc based on part of the paragraph from *Lucent* that is quoted above.  *Uniloc*, 632 F.3d at 1319-20.  The court in *Uniloc*, however, rejected Uniloc's argument because it stated that the court's "precedents do not allow consideration of the entire market value of accused products for minor patent improvements *simply by asserting a low enough royalty rate*." *Id.* at 1320.  Here, however, Plaintiff is not simply asserting a lower rate to use the entire base of the accused products.  Instead, Plaintiff bases its analysis on approximately 13 comparable licenses of the patents-in-suit that also use the entire base of the licensed product, and Defendants do the same.  Therefore, Dr. Magee's use of the entire value of the accused products is "economically justified" and Defendants' motions are DENIED in this respect.

### B. *Dr. Magee's Tripling of the Standard Royalty Rate to Account for Uncertainty*

Dr. Magee opines that the "standard royalty rates" of 1% for monitors and 0.25% for televisions should be tripled, in accordance with the *Georgia-Pacific* factors, to account for the "uncertainty" that loomed over the licensing parties in the comparable licenses of the patents-in-suit. Although all defendants challenge some of the underlying licenses relied on by Dr. Magee for this opinion and those licenses are discussed in the next subsection, defendants also challenge Dr. Magee's "tripling" theory, and that is the subject of this subsection. Because Federal Circuit law allows for the fact that real world licenses might be greatly reduced for uncertainty, the Court will allow Dr. Magee to opine that the "standard royalty rates" would be tripled if infringement and validity were established.

First, although the jury may find that there should be no tripling of the standard rates, there is nothing inherently wrong with Dr. Magee giving an opinion that the rates should be increased for the lack of "uncertainty." The licenses at issue all appear to be executed before litigation (or at least before there was an adjudication regarding validity and infringement). At that time, the parties executed the license in the "real-world" with uncertainty regarding the validity of the patents and infringement of the licensed products. In the hypothetical negotiation, however, the patent is assumed to be valid and the accused products are assumed to infringe. Therefore, as compared to the "real-world" in which the licenses to the patents-in-suit were negotiated, the patentee in the "hypothetical-world" is in a better bargaining position. How much better is debatable, but that decision is for the fact-finder. Accordingly, it is rational and economically sensible, due to this fact alone, that the patentee in the "hypothetical-world" may receive a more favorable royalty rate than in the "real-world."

The Federal Circuit has endorsed this principle. *See, e.g.*, *ResQNet.com*, 594 F.3d at 872 ("[A] reasonable royalty may permissibly reflect the fact that an infringer had to be ordered by a court to pay damages, rather than agreeing to a reasonable royalty.") (internal quotes omitted); *TWM Mfg.*, 789 F.2d at 900 ("That [the patentee] might have agreed to a lesser royalty is of little relevance, for to look only at that question would be to pretend that the infringement never happened."). Likewise, Chief Judge Markey of the Court of Customs and Patent Appeals recognized that:

> The setting of a reasonable royalty after infringement cannot be treated, as it was here, as the equivalent of ordinary royalty negotiations among truly "willing" patent owners and licensees. That view would constitute a pretense that infringement never happened. It would also make an election to infringe a handy means for competitors to impose a "compulsory" license upon every patent owner.
>
> Except for the limited risk that the patent owner, over years of litigation, might meet the heavy burden of proving the four elements required for recovery of lost profits, the infringer would have nothing to lose, and everything to gain if he could count on paying only the normal, routine royalty non-infringers might have paid. As said by this court in another context, the infringer would be in a "heads-I-win, tails-you-lose" position.

*Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152, 1158 (6th Cir. 1978) (Markey, J., sitting by designation).

Further, as a matter of policy, Plaintiff should at least be able to make the argument that at the hypothetical negotiation the royalty rate would be increased due to the lack of uncertainty. Otherwise, as Plaintiff states and as stated similarly above, the economic dynamic would resemble "heads I win, tails I break even." (Dkt. No. 454, at 3.) And a contrary holding would discourage patentees from licensing their patents at a lower, pre-litigation rate (to account for

9

uncertainty) because they would run the risk that they would be capped by that licensing rate in future cases.

Of course, as discussed above, Dr. Magee may opine that the standard licensing rate may be *increased* to account for uncertainty. It is another issue, however, whether the standard licensing rate should be tripled. According to *Daubert*, Dr. Magee's "tripling" opinion must be supported by sufficient facts or data. As will be discussed in the next subsection, the Court will allow Dr. Magee to rely on evidence that provides sufficient facts and/or data for Dr. Magee's opinion that a hypothetical negotiation royalty would be three times the standard royalty rate. For example, Mondis's pre-litigation licensing documents, where Mondis and/or Hitachi were clear that 3% was their "litigation rate," constitute probative evidence supporting Dr. Magee's opinion. Furthermore, Federal Circuit case law provides examples where the royalty determined at trial is three times (or more) higher than the established or "standard" industry royalty rates that are negotiated pre-suit. *See, e.g.*, *SmithKline Diagnostics, Inc. v. Helena Labs. Corp.*, 926 F.2d 1161, 1168 (Fed. Cir. 1991) (affirming a district court's determination of a 25% royalty when standard royalties for the defendant with similar products had rates of 3% and 5%); *Bio-Rad Labs., Inc. v. Nicolet Instrument Corp.*, 739 F.2d 604, 617 (Fed. Cir. 1984) (affirming a jury's royalty rate of approximately one-third when the "industry royalty rate runs from three to ten percent of sales" because "[t]hough established royalty rates are normally applicable . . . they do not necessarily establish a ceiling for the royalty that may be assessed after an infringement trial") (abrogated on claim construction grounds due to *Markman v. Westview Instruments*, 52 F.3d 967 (Fed. Cir. 1995)); *Deere & Co. v. Int'l Harvester Co.*, 710 F.2d 1551, 1554, 1558 (Fed. Cir. 1983) (upholding a 15% reasonable royalty even though before the infringement suit began,

the patentee offered a license to the infringer, under the patent-in-suit, at a rate of 1%). The Court also observes that for the approximately 13 comparable licenses to the patents-in-suit, the parties to the licenses were sophisticated and understood that future litigation was possible, and that may have created uncertainty or "skew[ed] the results." *ResQNet.com*, 594 F.3d at 872.

Finally, the Court observes that this week, on June 13, 2011, the Federal Circuit faced a similar question and stated:

> The defendants also argue that Spectralytics placed a low value on its invention, because in 2004 Spectralytics sold its assets for $4 million plus a contingent 25-percent of any recovery for patent infringement. The district court found that the jury could reasonably have concluded that this pricing arrangement had little relevance to a reasonable royalty. We agree with the district court that this circumstance does not render a 5-percent royalty unreasonable, for, as the district court explained, Spectralytics "hoped that the patent would survive any challenge to its validity, but Spectralytics did not really know for certain, and it could not really know for certain without paying millions of dollars in legal fees to launch lengthy and risky litigation. Thus, the value assigned to the '277 patent in 2003 would have reflected a very deep discount." 650 F. Supp. 2d at 916. The district court observed that the weight to be given to this aspect "was a task for the jury, and a reasonable jury could have chosen to give very little weight to this evidence." *Id.*

*Spectralytics, Inc. v. Cordis Corp.*, Case No. 2009-1564 & 2010-1004, slip op. at 18 (Fed. Cir. June 13, 2011). As this quote from *Spectralytics* indicates, the Federal Circuit recognizes that a patent may be less valuable at an earlier time (i.e., when it reflects a "deep discount") when there is uncertainty as to its validity or infringement. Further, the court in *Spectralytics* stated that the weight to be given to this type of evidence is a task for the jury. As indicated above, the Court holds that there are sufficient facts and data underlying Dr. Magee's opinion, and a reasonable jury could decide that the comparable licenses were given at a "deep discount," which in this case could be one-third. Therefore, whether Dr. Magee's "trebling" opinion is to be accepted is a question for the jury and, consequently, Defendants' motions are DENIED on this issue.

C.  *Licenses and/or Other Evidence Relied on By Dr. Magee*

The defendants challenge various licenses and other evidence relied on by Dr. Magee for his opinions. First, Mondis states that Dr. Magee will not offer opinions at trial regarding the RoyaltySource licenses, the CMO licenses, and the LCD TV licenses. These licenses are excluded and Dr. Magee is precluded from relying on them, so Defendants' motions are GRANTED in this respect.

Second, Defendants' motion with respect to the Elonex licenses from the default judgment proceedings is GRANTED. The "tripled" royalty rates in these default judgments were uncontested and the court rendering default judgment did not specifically adopt Elonex's "tripling" theory but instead adopted only Elonex's damages number. Without more, the Court will not allow Dr. Magee in this case to rely on the Elonex licenses.

Third, Defendants' challenge to the treble rate provisions in the LG, Wistron, and Fergason licenses is GRANTED. Each of the licenses contains a similar clause that states if the licensee challenges or participates in a challenge of the validity of the patents then the licensor will enforce the royalty rates at three times the original rates. Dr. Magee may not rely on the provisions in those licenses that discuss the tripling of the rates to support his "tripling" theory. This is because these provisions are for the purpose of penalizing the licensee for challenging validity. As penalty clauses,[5] they would not be relevant for the purpose that Dr. Magee intends to use them—that is—to show that by removing the "uncertainty" of invalidity, the royalty rate

---

[5] As an aside, a reasonable royalty for patent infringement is meant to compensate not punish. To be clear in this case, however, Dr. Magee's "tripling" theory is not to punish defendants, as would treble damages for willful infringement. Rather, Dr. Magee's trebling theory is to account for the differences in a "real-world" negotiation and a "hypothetical" negotiation, as explained above in this Memorandum Opinion and Order.

would be tripled. Dr. Magee admits these are penalty provisions. (*See* Magee Depo., Dkt. No. 398-2, 133:25-134:4 ("I'm just saying that my lay understanding is that if people make an agreement to pay royalties and they run out and try to get the patents invalidated, that there will be a penalty for that. One of the penalties is a trebling of the rate.").) Further, if these clauses were for the purpose of compensating the patentee for the removed "uncertainty" after the patent is found valid, as Mondis contends, then the provisions would be applicable only if the patent is ultimately challenged and found valid. Instead, as the provisions are written, the tripling penalty is imposed by merely bringing a challenge to validity, regardless of whether the patent is ultimately found valid. (*See, e.g.*, Fergason license, Dkt. No. 404-5, ¶ 3.8.)

Finally, Dr. Magee may rely on positions taken during licensing negotiations as evidence of his "tripling" theory. Dr. Magee relies on charts or other information provided by Hitachi and/or Mondis that were presented during various license negotiations that show a 3% rate is an indicative post-litigation rate—but alternatively offer a two-thirds discount to 1% for an earlier settlement. Defendants' argument that these are merely "puffing" statements made during negotiation is more properly a matter for cross-examination. This evidence is supportive of Dr. Magee's view that the real-world standard rates were deeply discounted. The evidence also supports Dr. Magee's view concerning the extent to which the license rates were discounted for uncertainty. Therefore, Defendants' motions are DENIED in this respect.

## IV. CONCLUSION

For the above reasons, Defendants' motions are GRANTED-in-part and DENIED-in-part.

**IT IS SO ORDERED.**

SIGNED this 14th day of June, 2011.

_____
CHARLES EVERINGHAM IV
UNITED STATES MAGISTRATE JUDGE