```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF TEXAS
 2                    MARSHALL DIVISION

 3  MONDIS TECHNOLOGY, LTD        *    Civil Docket No.
                                  *    2:07-CV-565
 4  VS.                           *    Marshall, Texas
                                  *
 5                                *    June  23, 2011
    LG ELECTRONICS, INC., ET AL   *    8:30 A.M.
 6
                    TRANSCRIPT OF JURY TRIAL
 7          BEFORE THE HONORABLE T. JOHN WARD
               UNITED STATES DISTRICT JUDGE
 8

 9  APPEARANCES:

10  FOR THE PLAINTIFFS:    MR. OTIS CARROLL
                           Ireland Carroll & Kelley
11                         6101 South Broadway
                           Suite 500
12                         Tyler, TX    75703

13                         MR. MARTIN BLACK
                           MR. KEVIN FLANNERY
14                         Dechert
                           2929 Arch Street
15                         Cira Centre
                           Philadelphia, PA   19104
16
                           MR. JEFFREY PLIES
17                         Dechert
                           300 West 6th Street
18                         Suite 2010
                           Austin, TX    78701
19

20  APPEARANCES CONTINUED ON NEXT PAGE:

21

22  COURT REPORTERS:       MS. SHELLY HOLMES, CSR
                           MS. SUSAN SIMMONS, CSR
23                         Official Court Reporter
                           100 East Houston, Suite 125
24                         Marshall, TX   75670
                           903/935-3868
25  (Proceedings recorded by mechanical stenography,
    transcript produced on CAT system.)
```

APPEARANCES CONTINUED:

```
FOR THE DEFENDANTS:      MR. ERIC FINDLAY
INNOLUX                  Findlay Craft
                         6760 Old Jacksonville Highway
                         Suite 101
                         Tyler, TX    75703

                         MR. JAMES BROGAN
                         MR. WAYNE STACY
                         MR. EAMONN GARDNER
                         MR. DAVID KELLIS
                         Cooley Godward Kronish
                         380 Interlocken Crescent
                         Suite 900
                         Broomfield, CO    80021


HON HAI                  MR. GIL GILLAM
                         Gillam & Smith
                         303 South Washington Avenue
                         Marshall, TX    75670

                         MR. JOHN PARKER
                         Paul Hastings Janofsky & Walker
                         600 Peachtree Street, NE
                         Suite 2400
                         Atlanta, GA    30308

                         MR. TERRANCE GARNETT
                         Paul Hastings Janofsky & Walker
                         515 South Flower Street
                         25th Floor
                         Los Angeles, CA    90071


        *        *        *        *        *        *
```

1                        P R O C E E D I N G S

2

3                  COURT SECURITY OFFICER:  All rise.

4                  (Jury in.)

5                  THE COURT:  Please be seated.

6                  Morning, Ladies and Gentlemen.

7                  Morning, Counsel.  Y'all ready to

8    proceed?

9                  MR. GARDNER:  Yes, Your Honor.

10                 THE COURT:  All right.  Let's proceed.

11                 Mr. Donaldson, you ready?

12                 THE WITNESS:  Yes, sir.

13                 THE COURT:  Good.  Let's go.

14                 MR. GARDNER:  So Bryan, can you pull up

15   202-02, please?

16          RICHARD L. DONALDSON, DEFENDANTS' WITNESS,

17                       PREVIOUSLY SWORN

18                     DIRECT EXAMINATION

19   BY MR. GARDNER:

20        Q.   Good morning, Mr. Donaldson.

21        A.   Good morning.

22        Q.   So yesterday when we left, I believe you were

23   going to explain how you calculated the total amounts

24   shown here?

25        A.   Yes, sir.

1      Q.    In making these calculations, did you assume

2 that the patent claims were valid and infringed?

3      A.    Yes, I did.

4      Q.    Now --

5                MR. GARDNER:  Bryan, will you go to

6 200-02, please?

7      Q.    (By Mr. Gardner)  So I want to take the 1

8 percent royalty as an example and have you explain the

9 calculation you performed.  So from 2008 forward, I see

10 that you list both patent families, both the '090 and

11 the '812.

12           During that time period, would the full 1

13 percent rate apply?

14      A.    Yes, sir, it would.

15      Q.    And then we have the period from April 2005

16 until January 2008 and I see that only the '090 is in

17 that time period.  Would the full rate still apply

18 during that time period?

19      A.    No, sir, I do not believe it would.

20      Q.    And what royalty rate do you think is

21 applicable during that time period?

22      A.    I believe a rate of using the example of 1

23 percent for the entire patent portfolio, I believe a

24 rate of 0.5 percent would be appropriate.

25      Q.    And why is that?

 1      A.   Because there's only one of the two patent

 2 families that exist during that period of time.

 3      Q.   So how did you come to select the 0.5 or half

 4 of the -- the 1 percent?

 5      A.   Well, there were two reasons.  One, I relied

 6 upon the testimony of Dr. Rhyne who looked at the

 7 technical contribution of each of the two patent

 8 families and concluded that they -- from a technical

 9 point of view they were basically the same.  And I also

10 relied upon my own knowledge of licensing of patents in

11 this industry that relate to standards and the practice

12 being that if you have two patents both of which are

13 necessary for a standard, they are normally considered

14 to be of equal value.

15      Q.   Can you explain to the jury how you actually

16 made the calculation in order to come up with the

17 numbers that -- that we started off with?

18      A.   Well, sure.  It's just straight math.  During

19 the period from 2005 to 2008 when only the '090 patent

20 family existed, there's a 2.4 billion dollar revenue

21 base.  I multiplied that 2.4 billion times 0.5 percent

22 and came up with a royalty for that period of time.

23           Then going to the second period of time where

24 both patent families existed, there was a 1.7 billion

25 royalty base, I multiplied that times 1 percent and then

1  I added those two royalty numbers together for the total

2  royalty that we saw on the prior chart.

3           MR. GARDNER: So Bryan, will you go back

4  to 202-02, please.

5      Q.   (By Mr. Gardner) Are these the numbers that

6  you're referring to?

7      A.   Yes. In -- in the bottom one where we use the

8  rate of 1 percent would result in 29.6 million dollars

9  of royalty. And if you were to use a 0.5 percent as the

10 maximum royalty rate, it would be 15 million. And then

11 for the total royalty for all the patents in this suit,

12 you would add the $400,000 dollars for TVs.

13     Q.   So for this chart, does this reflect your

14 opinion regarding the appropriate royalty if the HP

15 sales are excluded or covered by the HP license

16 agreement?

17     A.   Yes, sir, it does.

18     Q.   Now, did you also perform this same type of

19 calculation if the HP sales are included, meaning

20 they're -- and not covered if the jury determines that

21 they're not covered by the HP license agreement?

22     A.   Yes, I also did that calculation.

23     Q.   All right.

24           MR. GARDNER: Bryan, can you pull up

25 202-01, please?

1    Q.   (By Mr. Gardner)  And can you tell the jury

2  what, in your opinion, the appropriate royalty would --

3  rate would be or the appropriate royalty would be if HP

4  sales are included?

5    A.   Yes.  Again, if you use a royalty rate,

6  maximum royalty rate of 0.5 percent, that would result

7  in royalties of 20.8 million dollars.  And if you use

8  the 1 percent maximum royalty rate, the amount for

9  monitors would be 41.5 million, and to each of those you

10  would add the $400,000 for the televisions.

11             MR. GARDNER:  You can take that down,

12  Bryan.

13             And pass the witness, Your Honor.

14             THE COURT:  Cross-examination.

15             MR. BLACK:  Thank you, Your Honor.

16                    CROSS-EXAMINATION

17  BY MR. BLACK:

18    Q.   Okay.  All right.  Mr. Donaldson, you're the

19  third damages expert to testify in this case, and I like

20  to identify at least the points of agreement among the

21  damages experts; is that a fair place to start?

22    A.   It's fine with me, sir.

23    Q.   Great.  All the damages experts agree today

24  that the royalty base, the total base of possible

25  infringing products in this case from Innolux is 5.6

1  billion dollars, correct?

2     A.   I would agree with that.

3     Q.   Are you aware -- were you here when Dr. Magee

4  testified?

5     A.   I was.

6     Q.   Did you hear all the trouble he had to go

7  through in order to figure out that 1.3 billion dollars

8  in sales of products which were coming into the United

9  States; did you hear that testimony?

10    A.   I heard his testimony.

11    Q.   You heard how he had to go through -- his team

12 had to go through 13 million pages of documents to

13 ferret out the invoices and find the concealed sales;

14 did you hear that?

15    A.   I heard his testimony?

16    Q.   And then he prepared a report identifying that

17 1.3 billion dollars in sales in the royalty base and you

18 agree with him that it's part of the royalty base,

19 right?

20    A.   I do.

21    Q.   Now, you claimed a moment ago that sales to HP

22 should be excluded, right, from the royalty base?

23    A.   I said there's two possibilities.  HP sales

24 are included or excluded and I calculated royalties

25 under both circumstances.

1      Q.   Oh, you don't know whether the HP sales should

2   be included or not included?

3      A.   I have not formed an opinion on that.

4      Q.   You are a licensing expert, correct?

5      A.   I am.

6      Q.   You said that you would negotiate hundreds of

7   agreements for Texas Instruments, right?

8      A.   That is correct.

9      Q.   Are you familiar with the term have-made

10   rights?

11      A.   I sure am.

12      Q.   What's a have-made right?

13      A.   It's a provision where a patent owner can

14   permit a licensee to -- such as Hewlett-Packard in this

15   case, to have products made for its own benefit by some

16   other person, such as an Innolux.

17      Q.   And those types of agreements, when those

18   rights are granted, they're carefully negotiated,

19   correct?

20      A.   Most of the time, they are.

21      Q.   Yeah.  It's a little bit of a hot button in

22   patent licensing to give have-made rights, isn't it?

23      A.   It is today, yes.

24      Q.   Yes.  And it was in the HP agreement, which

25   you reviewed as part of your report.

 1              MR. BLACK:  Could we put up 1096, Page 5,

 2  please?

 3       Q.   (By Mr. Black)  This is the HP agreement; do

 4  you recognize it?  You referred to it in your report.

 5  Do you recognize this agreement, sir?

 6       A.   Yes, sir, I do.

 7              MR. BLACK:  Would you please blow up

 8  Section 2.05?

 9       Q.   (By Mr. Black)  You see that provision, the

10  license granted by a party to have licensed products

11  made by a third-party manufacturer; do you see that?

12       A.   Yes, I see that.

13       Q.   That's the have-made provision of this

14  agreement, right?

15       A.   Yes, it is.

16       Q.   And it has three exceptions, doesn't it?

17       A.   That is correct.

18       Q.   And if any one of the exceptions applies, the

19  HP products are not licensed, correct?

20       A.   That is correct.

21       Q.   And it's -- and the burden of proof on license

22  is on the Defendant, right?

23       A.   I believe that's my understanding of the law.

24       Q.   Would you look at the -- Section A says:

25  Notwithstanding the foregoing?

1            MR. BLACK:  And go down to the next --

2  next -- to the end, one more line, right there.  Right

3  there.

4      Q.   (By Mr. Black) Notwithstanding the foregoing,

5  a request from the licensee that the third-party

6  manufacturer provide a product which merely complies

7  with an industry standard, for example, VESA is outside

8  the license; isn't that right?

9      A.   There's also some additional language that you

10 haven't highlighted, but that's -- that's what it says.

11 It says what it says there, yes.

12     Q.   Okay.  And that means that if the request by

13 HP to Innolux is for product that complies with a VESA

14 standard, it's not covered by this have-made right;

15 isn't that right?

16     A.   Without further guidance, I would agree with

17 you.

18     Q.   Thank you.  The second exception is that the

19 HP license does not apply to claims, the infringement of

20 which would necessarily occur because of compliance with

21 such specifications, do you see that?

22     A.   I do.

23     Q.   Do you have an opinion on whether or not the

24 products in this case necessarily occur and infringe

25 because of compliance with the VESA specifications?

1    A.    I have a personal opinion, yes.  I was not

2    asked to analyze this, and I did not provide an opinion

3    in my report and I'm not sure I'm permitted to give my

4    personal opinion.  I haven't analyzed the agreement for

5    that purpose, but just looking at these words, would you

6    want me to give you my personal opinion?

7    Q.    I don't think we want your personal opinion if

8    you haven't put it in your report, sir, but...  You

9    haven't heard any evidence in this case from the

10   Defendants that they complied with this provision, have

11   you?

12              I'll withdraw the question.

13              Let's look at the third exception.  This

14   exception says:  That the have-made rights should not

15   apply to any products identical or substantially

16   identical to those manufactured or marketed by the

17   third-party manufacturer prior to licensee's furnishing

18   of said specifications.

19              Now, that actually would require a technical

20   opinion, wouldn't it, with respect to whether the

21   products were identical or substantially identical?

22   A.    Yes, it would.

23   Q.    And the Defendants have not offered any

24   technical opinion in this case on that subject, have

25   they?

1    A.   I don't know.

2    Q.   You -- you were sitting here for the trial,

3  you haven't heard any, right?

4    A.   I'm not sure.

5    Q.   Did you listen to Dr. Rhyne's testimony?

6    A.   I did, and I listened to some of the

7  deposition testimony.  It just -- I wasn't focused on

8  this issue.  I'm just not sure whether there were

9  discussions about what the specifications of Hitachi's

10 products were -- I mean, of Hewlett-Packard's products.

11 I know there were, like, hundred page specifications and

12 I'm not sure whether they were -- and they were for

13 Hewlett-Packard only, so I'm not sure that -- I think

14 that would support a conclusion that they were not

15 substantially identical to other people because other

16 people couldn't use them.

17    Q.   You have asked the jury to exclude from the

18 royalty base 1.5 billion dollars in sales because of the

19 HP license, right?

20    A.   No, sir, that's not what I've asked.

21    Q.   Okay.  All right.  Let's move on.  Mr.

22 Donaldson, were the licensed patents licensed for an

23 establishing customary rate of 1 percent?

24    A.   I believe they were.

25    Q.   Okay.  All right.  Now, you referred in your

1  testimony to the TPV license; do you recall that?

2       A.   Yes, sir.

3       Q.   And you said that there were certain discounts

4  that were given to TPV; do you recall that?

5       A.   Yes.

6       Q.   And you selected the TPV license because it

7  was one of the handful of licenses which had -- where

8  the Defendant had received a discount, right?

9       A.   That was one of the reasons I selected it.

10      Q.   All right.  And you put a chart up for the

11  jury --

12            MR. BLACK:  And if we could go to the

13  ELMO, please.  Thank you.

14      Q.   (By Mr. Black)  This was your chart on TPV,

15  right?

16      A.   That is correct.

17      Q.   And you're trying to tell the jury that Mondis

18  is asking for 10 times what TPV got, right?  What -- not

19  what TPV got -- yeah, Mondis is asking for 10 times what

20  TPV got, right?  That's what that big 10 X arrow is for,

21  right?

22      A.   For royalties relating to past sales, that's

23  what this chart shows, yes, sir.

24      Q.   Okay.  Well, Mr. Donaldson, the .3 percent was

25  for past sales negotiated with TPV in November of 2004,

1   right?

2        A.    That is correct.

3        Q.    And the going-forward rate in the TPV license

4   that was calculated by Mr. Spiro was .5 percent, right?

5        A.    That is correct.

6        Q.    And the hypothetical negotiation between

7   Mondis and the Defendants in this case would have been

8   looking at a going-forward rate, correct?

9        A.    That is correct.

10       Q.    So therefore, the appropriate thing to do

11  would have been to start with the .5 percent rate, not

12  the .3 percent rate; isn't that correct?

13       A.    That would also be inappropriate, I would not

14  disagree with that.

15       Q.    Okay.  Well then, let's just draw it on here.

16  So -- so that takes us to about .5 percent.  Now, the

17  TPV agreement was the very first agreement in the

18  licensing program, correct?

19       A.    I would have to go back and check.  As far as

20  putting forth these standard rates, I believe that is

21  correct.  I think there were some other licenses that

22  may have preceded it under which these patents were

23  licensed.

24       Q.    Well, I'll put Mr. Mimms's slide up to refresh

25  your recollection, he's your co-damages expert for the

1  Defendants.  This was his slide; do you recall that

2  slide?

3      A.   I do.

4      Q.   And the very first license on there, could you

5  show use -- tell us what that is?

6      A.   What Mr. Mimms has shown is 2004.  That still

7  doesn't resolve the question I had about whether there

8  may have been some other -- I'm -- I'm thinking -- I --

9  I'm not sure.  I'd have to look at the -- at my report,

10  but I will accept that.

11      Q.   Okay.  That's the first license that Mr. Mimms

12  thought was relevant in -- looking at the licensing

13  program, right?

14      A.   That is correct.

15      Q.   And you don't disagree with Mr. Mimms, do you?

16  Or do you?

17      A.   No, as far as his being the first license, I

18  will accept that.

19      Q.   Okay.

20      A.   Under these established rates, I'll put -- put

21  it --

22      Q.   Now, you --

23      A.   -- that way.

24      Q.   -- now, you testified yesterday that one of

25  the things that -- that licensors do in license

1  negotiations is they try to incentivize people to take

2  licenses earlier by saying to people things like, well,

3  if you'll take a license now or shortly in the future

4  within some deadline, you'll get a better rate, a

5  discount; you said that, right?

6        A.   That's common, yes.

7        Q.   Yes.   In fact, you offered that to folks when

8  you were working at TI from time to time, didn't you?

9        A.   I'm not sure.

10       Q.   Okay.   Well, you said it's a common practice.

11 It may have been everybody else's common practice but

12 not yours?

13       A.   That's very possible.

14       Q.   Okay.   Certainly nothing wrong with that

15 practice, right?

16       A.   No.

17       Q.   Okay.   Now, TPV got a first-mover discount in

18 this case.   Do you think Innolux is entitled to a

19 first-mover discount in this case, sir?

20       A.   I'm not sure that I've seen any evidence that

21 TPV got a first-mover discount.

22       Q.   Okay.   Well, we did hear from Mr. Spiro; were

23 you here for that testimony?

24       A.   I heard Mr. Spiro's testimony.   I don't recall

25 him saying that this was -- there was a specific

1  discount for first mover.

2      Q.   Well, let's just assume for the moment that

3  there is, okay?

4      A.   Okay.

5      Q.   That would take us up to 1 percent, right?

6      A.   Not in my view, it wouldn't.

7      Q.   Okay.  Now, it's also important in evaluating

8  the -- a license agreement to look at all of the

9  consideration that is provided by the licensee to the

10  licensor, correct?

11     A.   That is correct.

12     Q.   And sometimes that consideration comes in the

13  form of money and very often some of that consideration

14  comes in the form of patents that the licensee licenses

15  back to the licensor, right?

16     A.   It could, yes.

17     Q.   And the TPV agreement is, in fact, such a

18  license where TPV licensed its patents to Hitachi; isn't

19  that right?

20     A.   I believe that is correct.

21     Q.   So we would have to account for that here when

22  looking at the value provided by TPV to Hitachi; isn't

23  that right?

24     A.   If you could account for it, yes.

25     Q.   Okay.  Okay.  And in addition to that

1 consideration, last week TPV agreed to pay 12 million

2 dollars out of these patents for televisions, correct?

3     A.   That is correct.

4     Q.   So that's additional consideration, right,

5 that TPV has agreed to pay on these patents, right?

6     A.   That is correct.

7     Q.   Okay.  Okay.  Now, with respect to the 3

8 percent number, that number is post-judgment assuming

9 that the patents are valid and infringed, right?

10     A.   I don't agree with that.

11     Q.   You don't agree that the 3 percent number for

12 the hypothetical negotiation that we're claiming is

13 based on an assumption of infringement and validity?

14     A.   No.

15     Q.   Okay.  Well, the standard rate is 1 percent,

16 right?

17     A.   That's the established rate, yes.

18     Q.   All right.  So we're over here.

19         I got a red pen.  That was a mistake.

20         Now, the TPV rate over here is before a

21 finding of infringement and validity, right?

22     A.   The TPV is an arm's length license negotiation

23 that did not go through litigation, that is correct.

24     Q.   That is correct.  And it's therefore not

25 subject to the assumption of a hundred percent validity

1  and a hundred percent infringement, right?

2      A.   I would agree with that.

3      Q.   You would?  You would agree with that?

4      A.   I would.

5      Q.   Yes, okay.  And the -- the 1 percent rate over

6  here for Dr. Magee, this rate right here would be the

7  right rate to look at to compare to this bar over here;

8  isn't that right?

9      A.   No, sir.  I think the right thing to look at

10 is what is a reasonable royalty when you consider all

11 the Georgia-Pacific factors before there is a lawsuit,

12 before there is any controversy over validity and

13 infringement, that's what we -- you're -- that's the

14 rules of doing a hypothetical negotiation.

15         So you don't talk about what if the patents

16 are valid and infringed in a post-litigation rate or

17 however you want to characterize it.  That's not part of

18 the hypothetical negotiations.

19     Q.   Your opinion in this case with respect to the

20 reasonable royalty is based on the assumption that the

21 hypothetical negotiation would involve a negotiation

22 over patents which are found to be valid and infringed;

23 isn't that right?

24     A.   My assumption is that the patents are valid

25 and infringed, and that's what I start from.  Again, I

1    start from that, looking at it in the year 2005.

2         Q.    And a valid and infringed patent, one that's

3    been adjudicated by a Court to be valid and infringed,

4    it's a lot more valuable than one which has not gone

5    through the rigors of that process; isn't that right?

6         A.    Under that hypothetical, I would say no, that

7    is not right.

8         Q.    Your opinion as a licensing expert is that a

9    patent which has been validated is worth no more than a

10   patent which has not been validated?

11        A.    You're comparing apples and oranges.  If

12   you're looking at royalty rates that were established in

13   real life negotiations where the parties sat down at a

14   table and they consider all the risk, sure patent

15   validity might be an issue there and that would tend to

16   decrease a royalty rate.

17           But what's also an issue is an injunction.

18   They may be required to shut down their entire factory

19   if the patent's held valid and infringed.  And in my

20   experience that has much more of an effect and would

21   cause the real life negotiated rate to be higher.

22   So if you're comparing that hypothetical negotiations

23   with a rate in real life negotiations, I don't agree

24   that the rate necessarily goes up because you assume the

25   patent's valid.

1    Q.   Is a patent which is found to be valid more or

2  less valuable than a patent which has not been found to

3  be valid?  Yes or no.  Which one?

4    A.   It depends upon the circumstances of what

5  you're looking at.  If you're looking at everything

6  else --

7    Q.   You don't know --

8    A.   -- if everything --

9    Q.   -- exact --

10   A.   -- else is equal and if you're not in a

11  lawsuit and if you have no established business that

12  might be shut down, a patent that's been held to be

13  valid I would say should be more valuable than one where

14  there's a question about validity.

15   Q.   Oh --

16   A.   But if you're comparing it to a real life

17  negotiation where there's a threat of an injunction, I

18  do not agree with you.

19   Q.   Well, somewhere in the middle of your answer I

20  think you said a patent that's valid would be more

21  valuable than a patent which has not been adjudicated to

22  be valid?

23   A.   Only if you put it in the right circumstances.

24   Q.   Like the hypothetical negotiation, right, sir?

25   A.   Where there's no infringement, where there's

1   no factory that might be shut down, where you don't have

2   to lay people off, I would agree with you.

3        Q.   Let's try it this way.

4             MR. BLACK:   Your Honor, I'm going to move

5   the board if that's okay.

6             THE COURT:   Yes.

7        Q.   (By Mr. Black)  All right.  Mr. Donaldson,

8   let's talk about some concrete examples and see if we

9   can get some agreement.  You were the head licensing

10  person at Texas Instruments, right?

11       A.   For most of my career, yes.

12       Q.   And you testified that you negotiated hundreds

13  of license agreements, right?

14       A.   That is correct.

15       Q.   And you developed licensing programs for Texas

16  Instruments which generated the company, I think you

17  testified yesterday, over a period of years, over four

18  billion dollars in royalties, right?

19       A.   Actually it was four separate licensing

20  programs, but the royalty amount is correct.

21       Q.   And that was just for, what, five years,

22  something like that, six years?

23       A.   That spanned probably close to 10 years.

24       Q.   Okay.  So 400 million dollars a year roughly

25  in patent licensing royalties, correct?

1        A.    That's what the math would show.

2        Q.    And when we're talking about four billion

3   dollars, we're not talking about four billion dollars in

4   product sales multiplied by 1, 2, 3 percent, we're

5   talking about 400 million dollars in patent royalties,

6   right?

7        A.    That is correct.

8        Q.    Patents can be really valuable, right?

9        A.    If you have Nobel Prize winning technology,

10  that's correct.

11       Q.    What if you have technology that a company

12  like Innolux absolutely has to have in order to be in

13  business, it would be pretty valuable to Innolux,

14  wouldn't it?

15       A.    I need more -- it could be valuable to them.

16       Q.    Now, you were faced with the same problem that

17  Mr. Spiro has been faced with, which is having patents

18  that were widely infringed by companies in Asia,

19  correct?

20       A.    That is correct.

21       Q.    And Texas Instruments, partly at your request,

22  formed an inside task force to try to deal with that

23  problem, didn't they?

24       A.    I'm not quite sure what you mean.

25       Q.    Did you lead a licensing program to try to

1  obtain royalties from Asian companies for TI's

2  electronics technologies?

3       A.   Yes, I did.

4       Q.   And that was an important, important

5  initiative by Texas Instruments, right?

6       A.   Yes, I believe it was.

7       Q.   It was a market changing event, you were very

8  proud of it, right?

9       A.   I would agree with that.

10      Q.   Took you years to make that a success, didn't

11 you?

12      A.   It did.

13      Q.   A lot of time on planes traveling back and

14 forth, right?

15      A.   Correct.

16      Q.   Just like Mr. Spiro, right?

17      A.   In some senses.

18      Q.   Now, you developed a methodology when you were

19 negotiating for Texas Instruments that had to do a

20 cross-license negotiation, didn't you?

21      A.   In that situation where we were dealing with

22 companies that had tens of thousands of patents, yes.

23      Q.   And when you went to meet with these

24 companies, they would say all sorts of things to tell

25 you why they didn't need their technology; isn't that

```
 1  right?

 2      A.   I'm not sure I agree with that

 3  characterization.

 4      Q.   Well, you -- you -- it's certainly true that

 5  you didn't just fly across the ocean, knock on

 6  somebody's door, say please take a license to our

 7  patents for millions of dollars and walk home with a

 8  signed agreement, right?

 9      A.   It wasn't quite that easy, no.

10      Q.   Yeah.  In fact, you, on behalf of the Texas

11  Instruments, had negotiations with companies that

12  sometimes lasted for months and years, right?

13      A.   That is correct.

14      Q.   And sometimes you had to enforce the patents

15  through litigation, right?

16      A.   That happened sometimes, also.

17      Q.   Sometimes in this court, right?

18      A.   That is correct.

19      Q.   There's nothing wrong with that, right?

20      A.   Nothing wrong with it.

21      Q.   Now, licensees would say many things to you,

22  sometimes they told you, oh, your patents are no good,

23  right?

24      A.   With respect to some of the patents, they may

25  say that.
```

1       Q.    And sometimes they told you the patents are

2   infringed, right?

3       A.    They would sometimes say that.

4       Q.    And sometimes they told you, well, we just

5   can't pay that much money, right?

6       A.    They would sometimes say that.

7       Q.    And sometimes they'd say, oh, we don't have

8   the gross margins in order to be able to pay that rate.

9       A.    I don't recall anyone saying that.

10      Q.    You don't recall anyone ever saying they

11  didn't have enough margin in order to pay your royalty

12  rates?

13      A.    Gross margins, no, I don't recall them saying

14  that.

15      Q.    Any kind of margin?

16      A.    Some people said they had low net profits, but

17  I don't recall anyone saying they didn't have sufficient

18  gross margins to pay.

19      Q.    Did you ever hear anybody say, I can't take a

20  license because I don't want to be at a competitive

21  disadvantage to my competitors if they're not licensed?

22      A.    That I heard from everyone.

23      Q.    Right.  Those are all things that Mr. Spiro

24  heard during this licensing program; isn't that right?

25      A.    I would suspect.

1     Q.   Now, you developed a methodology in which you

2  tried to sit down, if I understand it correctly, with

3  the potential licensee on the other side of the table

4  and identify three things with respect to a patent.  You

5  gave a percentage number for validity; a percentage

6  number for infringement; and a percentage number for

7  importance of the patent.  Isn't that right?

8     A.   In the context of that methodology, that is

9  correct.

10     Q.   Right.  So we had --

11          MR. BLACK:  We can take this down.

12     Q.   (By Mr. Black) -- so you had an infringement

13  percentage, and you multiplied it by a validity

14  percentage, and you multiply that by an importance

15  percentage, you multiply that by a base rate, right?

16     A.   At a very high level, that is correct.

17     Q.   And the infringement percentage was from 0 to

18  1, and the validity percentage was from 0 to 1, and the

19  importance percentage was from 0 to 1, right?

20     A.   That is correct.

21     Q.   In all the years you had in negotiating these

22  agreements in the real world, not the hypothetical

23  negotiation, we are going to talk about that, but in the

24  real world, you never saw a patent that people could

25  agree with a hundred percent val; isn't that right?

1      A.    That's not correct.

2      Q.    Let me get your --

3            MR. BLACK:  Your Honor, may I go back to

4  the table to get the deposition?

5            THE COURT:  Yes.

6      Q.    (By Mr. Black)  Do you recall testifying at

7  your deposition, I asked you the question:  So a patent

8  that received a one on infringement validity and

9  importance would have a rate of X percent, correct? If

10  there were such a patent?

11           Yes.

12           You were unable to find many of them, I

13  assume, in negotiations?

14           You said:  I think we were unable to find many

15  of them.

16           Is that right?  You never found the perfect

17  patent in a license negotiation, right?

18     A.    But that wasn't your question to me.

19     Q.    Did you ever find the perfect patent that got

20  a 1 on all three?

21     A.    No.

22     Q.    Okay.

23     A.    But I did find patents that we gave a hundred

24  percent value to for validity and a hundred percent

25  value to for infringements.

1      Q.    The average patent that you dealt with in

2  these negotiations was 50 percent, right, for

3  infringement, 50 percent for validity?

4      A.    I'm sorry, would you repeat that?

5      Q.    Let me try it this way, sir.  Let's assume

6  that we're using your methodology, the one that you used

7  at Texas Instruments, okay?  And you sit down with a

8  potential licensee and you guys discuss the infringement

9  of the patent and the licensee says it's not infringed

10  and you say it is infringed and you guys agree, all

11  right, let's call that one 50 percent, okay?

12      A.    It wasn't that simple.

13      Q.    Okay.  Well, that's -- we don't -- the result

14  in many cases was to come up with a decision that you

15  consider it to be 50 percent, right?

16      A.    Gosh, I don't know.  It was all over the

17  board.  It was -- some would be down to close to 0

18  percent, some would be higher.  I -- I don't recall ever

19  doing a statistical analysis to say that they averaged

20  halfway in between.

21      Q.    Sometimes it was 0, close to 0, sometimes it

22  was high.  I'm just trying to pick a number in the

23  middle.  50 percent, is that okay?

24      A.    Well, that's in the middle, but I'm not sure

25  that that's what this methodology resulted in.

1    Q.   Well, let's just assume it's a 50-50 deal,

2    okay?

3    A.   Well, you may assume that.  I don't think

4    that's accurate.

5    Q.   You never had a patent that you got -- that

6    was at 50-50?

7    A.   Im sure there was a patent, more than one

8    patent, probably.  I can't say that that's the average.

9    Q.   Okay.  And let's say that patent there's a

10   dispute over validity, okay, and everybody decides,

11   okay, you know what, we'll call that a 50-50 patent, all

12   right?  All right?

13   A.   All right.

14   Q.   Now, let's assume, just to make it a little

15   bit simpler, that this is a really important patent that

16   the licensee can't live with without.  So we're going to

17   give that a hundred percent.  We're going to give it a

18   1, okay?

19   A.   All right.

20   Q.   Tell you what, you pick the license rate, sir.

21   We need to have a base rate.  Would you pick a base rate

22   here?

23   A.   This is going to vary, and you need to

24   understand each --

25   Q.   Would you pick a base rate, please?

1    A.   I can't pick -- I'm not sure I can pick a base

2  rate that wouldn't -- we did use a base rate --

3    Q.   Don't --

4    A.   -- for this.

5    Q.   -- don't tell me what you used for Texas

6  Instruments.

7    A.   Well, you're asking me to pick one and the

8  only thing I can tell you is what I did personally.  The

9  base rate can be this --

10   Q.   I'll tell you what, let me -- I don't -- I

11  don't want to get into Texas Instruments' rates.

12  We're -- we're not --

13   A.   Okay.  Then I can't --

14   Q.   -- going --

15   A.   -- pick a base rate.

16   Q.   Okay.  Well, we'll pick a hypothetical rate

17  just for the sake of argument and we'll call it 4

18  percent, okay?  Now, what you would have done then is

19  you would have multiplied the 50 percent by the 50

20  percent by the 1, by the 4 percent, and in the real

21  world negotiation, you would have said that's a 1

22  percent patent.  That's the math.  50 percent, times 50

23  percent, times 1, times 4 is 1 percent, right?  Half

24  times a half is a quarter, quarter times 4 is 1?

25   A.   I guess I'm missing something mathematically.

1  I mean, it's -- when you do that multiplication, it --

2  if you multiply those, you don't come out with 1.  You

3  take .5 times .5 is .25 times --

4       Q.   .25 times 1 is --

5       A.   Okay.  That's --

6       Q.   Wait.

7       A.   .5 percent times .5 percent is a quarter of a

8  percent, okay.

9       Q.   Okay.  So it's 1 percent.  That's the real

10 world negotiation.  Now, the --

11      A.   Under your hypothetical.

12      Q.   -- hypothetical -- the hypothetical

13 negotiation that you have to do in this case assumes

14 validity and assumes infringement, right?

15      A.   That is correct.

16      Q.   So we've got to change this 50 percent to a 1,

17 right, for infringement, because now we're assuming

18 infringement, right?

19      A.   If you were going to apply that to a

20 hypothetical negotiation, yes.

21      Q.   Which is what you're here to do, right?

22      A.   But I'm here to apply rates under

23 Georgia-Pacific analysis of -- and this is not

24 transportable -- this was used as a proxy.  Each patent

25 that we looked at represented at least a hundred

1    additional patents.  This was the proxy shorthand way of

2    dealing with thousands of patents.  It's not directly

3    transportable to two patents.

4        Q.    Your -- your real world work at TI is not

5    transportable to your -- your testimony here today?

6        A.    The type of analysis I can do is

7    transportable.  The methodology used to evaluate tens of

8    thousands of patents is not directly transportable to

9    two patents is what I'm saying and there are

10   different --

11       Q.    I'm just --

12       A.    -- technologies.

13       Q.    -- I'm just going to move on.  It's been a

14   long trial.  We're almost done here.  I just want to get

15   this point in.

16           50 percent infringement, your negotiation,

17   hypothetical negotiation, 100 percent.  Validity.  50

18   percent validity has to go to 100 percent, right, in the

19   hypothetical?  You have to assume 100 percent validity,

20   correct?

21       A.    Okay.

22       Q.    The importance stays the same.

23       A.    I disagree with that.

24       Q.    The base rate stays the same.  1 times 1 times

25   1 times 4 is, can you tell us?

1    A.    I disagree with you.

2    Q.    4 percent, right?

3    A.    That's your math.

4    Q.    So -- but it's correct, isn't it?

5    A.    I don't agree with it.

6    Q.    Okay.  So in going from the Texas Instruments

7  methodology that you used when you were on the

8  patentholder side of this, by assuming that the patents

9  are valid and infringed, the rate goes from 1 percent to

10 4 percent?

11   A.    That is absolutely wrong.

12   Q.    You testified, Mr. Donaldson, that the patent

13 families in this case were of equal value, right?

14   A.    That is correct.

15   Q.    Yeah.  And you're aware, are you not, that

16 many of the initial licenses, especially the ones that

17 were done in the 2005 period when the hypothetical

18 negotiation would have taken place with -- with Innolux,

19 were actually only for the '090 family of patents; isn't

20 that right?

21   A.    Yes.

22   Q.    Okay.  So this is a little bit easier math,

23 but so if the rate was 1 percent for the '090 family,

24 right?  Right?

25   A.    Okay.

1     Q.   And someone then needed a license to the '812

2  family, right?

3     A.   Then that would say that people should have

4  been paying 2 percent and I've seen absolutely no

5  licenses of that case.

6     Q.   Right.  People should pay 2 percent.  Now, you

7  saw that there were a number of licenses on -- where the

8  licensees agreed to pay 1.75 percent for DDC/CI

9  compliant monitors, right?

10    A.   People had the choice of paying under two

11 options; either 1 percent or if they wanted to pay on

12 old devices at a .25 percent and more recent devices at

13 1.75, they could choose that.  Mr. Spiro has testified

14 the licensee could choose whatever they wanted and 1

15 percent was the rate that he was asking.

16        So yeah, you can point to an agreement where

17 someone because of their business mix wanted to choose

18 that scenario, but it's still Mr. Spiro has said 1

19 percent was the established rate for using all the

20 patents that were being licensed and many of the

21 licenses had both patent families.

22    Q.   Yes or no, did people pay 1.75 percent for

23 certain DDC/CI monitors?

24    A.   When they chose the option, that was

25 equivalent to 1 percent of paying .25 percent for old

1  devices and .1 -- 1.75 or something of that nature for

2  newer devices, some people chose that approach, yes.

3      Q.  Can you answer my question yes or no?  Did

4  some --

5      A.  I did --

6      Q.  -- people pay 1.75 percent for DDC/CI

7  monitors, yes or no?

8      A.  Yes, when they put it with that choice of the

9  option.

10      Q.  1.75 percent.  And some of those people were

11  people who only paid for the '090 family; isn't that

12  right?

13      A.  That's possible.

14      Q.  Right.  So if the '090 family is 1.75 percent

15  and the '812 family is worth the same, then maybe the

16  number should be 3.5 percent?

17      A.  And if I found any license agreements that

18  anyone had ever entered into at that rate, I would agree

19  with you, but no one has.

20          MR. BLACK:  Thank you, Mr. Donaldson.

21          Pass the witness.

22          MR. GARDNER:  Bryan, can you pull up

23  DX1096?  And can you go to 2.5 -- Section 2.5 -- or

24  2.05.  Thanks.

25      Q.  (By Mr. Gardner) So, Mr. Donaldson, I want

1  to -- I want to step back a little bit.

2         Mr. Black asked you a couple of questions

3  about this license agreement, and -- and the first

4  question, he -- I think he suggested that if any one of

5  these did not apply, then this -- this wouldn't be

6  applicable.

7         And do you see on the -- on Section B where it

8  says "and" at the second -- end of Section B here?

9     A.    Yes, I do.

10    Q.    And what does that -- what does that mean to

11 you?

12    A.    That these are additive, really.

13    Q.    Okay.  So you heard Mr. Lin from HP testify

14 that H -- Hewlett-Packard's specifications were

15 confidential when they were provided to companies such

16 as Innolux or Hon Hai.

17    A.    I did hear that, yes.

18    Q.    And the specifications had a lot of

19 requirements, right?  Hundreds of pages of a

20 specification, correct?

21    A.    That's my understanding.

22    Q.    And the exclusions and license agreement that

23 we have here, they show that the have-made rights

24 applied if the HP specification is merely in compliance

25 with the standard, right?

1              So if we look at the -- without -- or sorry

2    about that.  At the -- at the top of the -- on

3    Section A, about the fourth line down, it says:  Merely

4    complies with an industry standard.

5         A.   Yes, I see that.

6         Q.   All right.  Would a specification that's

7    hundreds of pages long merely comply with an industry

8    standard?

9         A.   Not in my opinion, no, and not in my

10   experience.

11        Q.   Mr. Black also asked you some questions about

12   TI's licensing program.  When TI went to litigation,

13   would they triple the royalty rate they requested from a

14   defendant?

15        A.   I have never done that in any of the licenses

16   that I negotiated.  I had an asking rate, and in some

17   cases, we actually had to go to -- through litigation,

18   sometimes even here in this court, and have a

19   determination of patent validity.

20             I never asked for a penalty.  I never asked

21   that that person have to pay more than what other people

22   paid.  In fact, they paid the same.

23        Q.   And why wouldn't Texas Instruments ever triple

24   the royalty when they went to litigation?

25        A.   Because that would be discriminating against a

1  company for -- just for wanting to satisfy themselves

2  that the patents were valid and infringed, and I didn't

3  think it was fair.

4      Q.   We also heard Mr. Black ask you some questions

5  about this kind of divided rate.  You could use the 0.25

6  percent and the 1.75 percent, and this comes out to the

7  blended rate of 1 percent.  Why would a company select

8  the 0.25 percent and 1.75 percent option?

9      A.   Well, a company would do that if they were

10 primarily making products that would qualify for the

11 0.25 percent.  So they would save money by not having to

12 pay the 1 percent.

13     Q.   So their effective license rate would actually

14 be lower than 1 percent.

15     A.   Yes, I believe that's -- that -- that's what

16 they anticipated when they made that selection anyway.

17     Q.   Companies don't select -- select an option in

18 order to pay more money, do they?

19     A.   Not in my experience, no.

20     Q.   And so just -- in your experience, hundreds of

21 licensing negotiations, 27 years doing this for a

22 living, would a company ever reasonably agree to pay

23 3 percent on something where everybody else in the

24 industry only paid 1 percent?

25     A.   In this industry, my experience, no.

```
 1              MR. GARDNER:  Thank you, Mr. Donaldson.

 2              THE COURT:  All right.  Mr. Donaldson,

 3    you may step down.

 4              THE WITNESS:  Thank you, Your Honor.

 5              THE COURT:  Thank you.

 6              Who will be your next witness?

 7              MR. BROGAN:  I believe that's all of our

 8    witnesses, Your Honor.

 9              THE COURT:  Rest?  Innolux rests?

10              MR. BROGAN:  We have some documents we

11    want to make sure to get in the record at some point.

12              THE COURT:  Okay.  Subject to that, you

13    rest?

14              MR. BROGAN:  Yes, Your Honor.

15              THE COURT:  Hon Hai?

16              MR. PARKER:  Subject to the same thing,

17    Hon Hai rests, Your Honor.

18              THE COURT:  All right.  Are you ready to

19    go forward with your rebuttal case?

20              MR. BLACK:  Yes, Your Honor.

21              MR. PLIES:  Your Honor, Plaintiff calls

22    Joseph Lamm back to the stand.

23              THE COURT:  Okay.

24              MR. PLIES:  Mr. Lamm, thank you for --

25              THE COURT:  Hold on a second.  We're
```

1  going to need to take a break, a comfort break.  Be back

2  ready to come back in the courtroom at 9:30, 9:30.

3                  The jury may leave the courtroom.

4                  COURT SECURITY OFFICER:  All rise.

5                  (Jury out.)

6                  THE COURT:  Court's in recess until 9:30.

7                  I need to see counsel.

8                  (Bench conference.)

9                  THE COURT:  We got a -- we got a signal

10 from the jury.  That's -- well, I was going to -- how

11 much time do you think you've got left on the

12 Plaintiff's side?

13                 MR. BROGAN:  That's these guys.

14                 MR. BLACK:  I think -- what is it?  About

15 half an hour?

16                 MR. PLIES:  Probably about 35, 40

17 minutes.

18                 THE COURT:  I wanted to make sure you

19 understood, you've got about 53 minutes, is what you've

20 actually got.

21                 MR. BLACK:  That's fine.

22                 THE COURT:  Okay.  I just want everybody

23 to know that you're running out of time.

24                 MR. PARKER:  Good.

25                 MR. BLACK:  Yeah.  I tell you what, Your

```
 1   Honor.  Will you give us a -- well, we'll keep track.

 2                   THE COURT:  You've got 53 minutes.

 3                   MR. BLACK:  Okay.  We only need about --

 4                   MR. PARKER:  Good.

 5                   MR. BROGAN:  52?

 6                   MR. BLACK:  Just leave me enough time to

 7   put Mr. Wedig on.  He's going to be very brief.

 8                   THE COURT:  Well, you've got 53 minutes.

 9                   MR. BLACK:  Understood.

10                   (Recess.)

11                   COURT SECURITY OFFICER:  All rise.

12                   (Jury in.)

13                   THE COURT:  Please be seated.

14      JOSEPH LAMM, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

15                       DIRECT EXAMINATION

16   BY MR. PLIES:

17       Q.   Mr. Lamm, thanks for joining us again.

18            How many claim charts do you have for us

19   today?

20       A.   Zero.

21       Q.   Have you formed an opinion with respect to the

22   validity of the asserted '090 claims?

23       A.   Yes, sir, I have.

24       Q.   And what's your opinion?

25       A.   That all of the claims that have been asserted
```

1    are valid.

2         Q.    Now, you're not going to be providing opinions

3    with respect to the validity of the '812 patent claims;

4    is that correct?

5         A.    Correct.  Just the '090 patent.

6         Q.    And is there a reason for that?

7         A.    Yes, sir.  Back when it was time to prepare

8    the rebuttal report of Dr. Rhyne regarding validity, I

9    was still -- I had just come off of analyzing monitors

10   for both TPV, LG, and Innolux and Hon Hai, and I think

11   something like 286 models.

12             And I had reviewed all the documentation for

13   almost 600 different models.  And I needed to -- I just

14   didn't feel like I could focus on more than one, and so,

15   therefore, I asked for -- asked for help, so...

16        Q.    Only so much -- only so much a man in a barn

17   can do, right?

18        A.    Absolutely.

19        Q.    What did you consider or review in forming

20   your validity opinions?

21        A.    Well, first, I looked at all the prior art

22   that had been brought up, looked at Dr. Rhyne's report,

23   and then finally, I listened to the testimony that's

24   been given here in this court.

25        Q.    And have you heard anything that's caused you

1    to rethink or change your opinions on validity?

2        A.    No, sir.

3        Q.    Now, after listening to the testimony this

4    week of Mr. Webb and Mr. Eccles, Mr. Lesh, Mr. Malden,

5    and Dr. Rhyne, do you have any observations concerning

6    the Defendants' invalidity assertions?

7        A.    Well, yes, sir.  It -- I'm kind of likening

8    this thing to a big puzzle.  You know, you've got a lot

9    of pieces to this thing.

10            You've got com controller.  You've got display

11   units.  You've got ID information.  You've got serial

12   numbers.  You've got type, function, all of these kinds

13   of things that are described in the various claims.  And

14   it takes all those pieces to -- to put this whole puzzle

15   together.

16            And if you look at all the prior art, none of

17   it does all of that, and it wasn't until Mr. Arai came

18   along and put all those pieces together to really --

19   really complete this puzzle.

20       Q.    Now, which prior art references did Dr. Rhyne

21   principally rely upon when rendering his invalidity

22   opinion?

23       A.    He relied on Mr. Webb, the Sony DDM, the big

24   monitor over in the corner, and then the Sawdon patent.

25       Q.    Okay.  Well, let's -- let's talk about each of

1   those one at a time.  Let's take up the Webb system.

2           In your opinion, does the Webb system render

3   any of the asserted claims of the '090 patent invalid?

4       A.   No, sir, it doesn't.

5       Q.   Does it render any of those claims

6   anticipated?

7       A.   No, sir.

8       Q.   Does it render any of those claims obvious?

9       A.   No, sir.

10      Q.   What, if any, puzzle pieces, as you say, are

11  missing from the Webb reference?

12      A.   Well, one of the big ones that's missing is

13  the communications controller.  And I think we've got --

14  if I could have his --

15              MR. PLIES:  Tracy, if you could put up

16  the demonstrative.

17      Q.   (By Mr. Plies) And is this the demonstrative

18  that was used by Mr. Webb the other day at trial?

19      A.   Yes, sir, it is.

20      Q.   And you were indicating it was missing an

21  element?

22      A.   Right.  The first one it's missing is -- that

23  I mentioned was the com controller.  Basically, if you

24  look over here on the left, it has this thing called a

25  personal computer, and that is hooked up to this little

1   block over here through this thing called control

2   signals, which he defined as being RS 232.

3          And I believe he also said at one point that

4   this was a UART and that UART is basically the universal

5   asynchronous receiver transmitter, and it's just a

6   basic -- a glorified way of saying it's a -- it's a part

7   that takes in eight data bits that come in one right

8   after another that groups them all together and presents

9   them to the processor eight bits at a time.  It's a

10  pretty simple little device.

11      Q.   Would one of ordinary skill in 1993 have

12  considered that to be a communication controller?

13      A.   No, sir, I don't believe so.

14      Q.   Now, you might recall Monday, I believe in

15  response to one of Mr. Brogan's questions, you had

16  indicated that if you have an I2C communication bus,

17  that you would need to have a communication controller.

18          And we do see here that there are some I2C

19  lines that Mr. Webb drew in the figure.  Does that mean

20  that there's a communication controller?

21      A.   Well, it means that this block up here labeled

22  communications controller really is one.  And if you

23  notice, there's a couple of things that are different.

24  This thing is actually talking to two different devices

25  up here, but this device right here (indicates) doesn't

1   communicate any of that information over to the PC, and

2   that's what's required by the claims.

3       Q.   Now, have you reviewed Mr. Webb's technical

4   documentation that was produced in this case?

5       A.   Yes, sir, I have.

6       Q.   And roughly how many pages of documentation is

7   that?

8       A.   I don't remember the exact number, but

9   something like 3,000 pages.

10      Q.   And did that include, for instance, some of

11  the documents that Mr. Webb was discussing when he was

12  testifying?

13      A.   Right, and all of his source code for the

14  products and the calibration software and so forth.

15      Q.   And when Mr. Webb testified, you heard him

16  initially identify the box as a UART and then him

17  expressing the term communications controller in

18  association with that box, did you?

19      A.   Yes, sir, I did.

20      Q.   And reviewing Mr. Webb's documentation, did

21  you find any instances where he had identified a UART as

22  a communication controller?

23      A.   No, sir, I didn't.

24      Q.   Can you explain a little bit more -- and

25  Mr. Webb did this a little bit -- about how the Webb

1   system was intended to be used?

2       A.   Well, the Webb system was intended to be used

3   in a factory calibration environment.  And that's

4   basically where you've got this thing sitting on a cart

5   at the end of a production line, and you've got this

6   expensive signal -- or pattern signal generator, along

7   with some cameras and a computer that does the

8   calibration.

9           And as the units come down the production

10  line, they hit this station, they get calibrated, and

11  then they proceed on to the next step, but -- and as

12  part of this, they have to make all these connections to

13  the unit.

14          The red -- you know, each of these signals are

15  separate.  You've got red, green, blue horizontal and

16  vertical sync all coming in as -- with their own

17  connectors, and then you've got this port for doing the

18  calibration.

19      Q.   And where was that port located on the monitor

20  that Mr. Webb talked about?

21      A.   What he had described was the port was on the

22  front of the unit, and all of the video signals were on

23  the back of the unit.

24          And, you know, in a production environment,

25  the -- the case probably would not have been attached at

1  that time, but to get access to that port, you would

2  have to pry off a little plate and then make your

3  connection that way.

4      Q.   So was the Webb system missing any additional

5  puzzle pieces as you call them?

6      A.   Yes, sir.  It was basically also missing the

7  plug-and-play piece.

8      Q.   Now, Mr. Webb had indicated that the

9  calibration computer needed to know display unit

10  information from the display on the production line in

11  order to configure itself to output the correct signals

12  to the display on the manufacturing floor.

13          Do you have an opinion about what Mr. Webb

14  said about that?

15      A.   Well, yes, I do.  It kind of didn't make a lot

16  of sense to me.  You know, I've seen a lot of production

17  lines, and the -- basically, what happens is, these

18  units come down the production line, and you're --

19  you're typically making a whole bunch of one item at a

20  time or one model number.

21          So you would be seeing, you know, hundreds or

22  thousands of that model, and then you would retool the

23  production line to be a different model, and you would,

24  you know, reconfigure everything.

25          So I don't see any need to read that

1  information out of every monitor and slow down the

2  production line in doing that.

3      Q.   Would the calibration computer already know

4  what signals those monitors would need?

5      A.   Right.  That would be part of the tooling of

6  the production line, is to set all those parameters into

7  the calibration computer.

8      Q.   Do you know if the Webb system was missing any

9  other puzzle pieces?

10     A.   Well, it was also missing things like the

11  function and the type and several of the things that are

12  identified as being display unit information.

13     Q.   Now, would there have been any motivation, in

14  your opinion, for someone to have taken the Webb system

15  and used it to send display unit information, such as ID

16  or type or timing data, to a computer to allow a

17  computer to configure the signals?

18     A.   No, sir.  Basically, the Webb system was what

19  we call a multisync monitor.  And, you know, there's a

20  lot of activity in the industry at that time trying to

21  figure out how to make monitors be able to handle any

22  frequency that the computer wanted to generate.

23  And so Mr. Webb's solution was to make the monitor be

24  able to configure itself to whatever the computer was

25  sending.

1          In other words, it didn't care what the

2   computer was sending.  It was going to do the best job

3   it could of putting up a picture.

4      Q.    So the information that was stored in the

5   memory of the Webb system, what was that information

6   being used for?

7      A.    What was described was information that would

8   be useful in a repair facility or something like that.

9   And it was basically information that the monitor used

10  internally to figure out how to put up a picture based

11  on whatever signals were coming in.

12     Q.    And is that similar or not similar to plug and

13  play?

14     A.    That's not at all -- that's the opposite of

15  plug and play, actually.

16     Q.    Let's talk a little bit about the Sony DDM.

17  In your opinion, does the Sony DDM system render any of

18  the claims invalid?

19     A.    No, sir.

20     Q.    Does it render any of the asserted claims

21  anticipated?

22     A.    No, sir.

23     Q.    Does it render any of the anticipated claims

24  obvious?

25     A.    No.

1    Q.   Now, you've previously indicated that you're

2  familiar with the Sony DDM, which is the huge behemoth

3  we all see here in the corner of the courtroom.  And I

4  was hoping you could elaborate a little bit more about

5  what your personal familiarity with that device is.

6    A.   Okay.  Well, I first started working on this

7  device in 1988, and I think I've added up about 15 years

8  of my career was spent basically designing graphics

9  controllers specifically designed for this product.

10    Q.   And, again, could you remind the jury what a

11  graphics controller is?

12    A.   Yeah.  The graphics controller is that piece

13  of the -- of a total system that generates the video

14  signals and the sync signals to be able put up a picture

15  on this unit.

16    Q.   So is it fair to say that that's the component

17  at the computer that generates the video and drive

18  signals for the monitor?

19    A.   Yes, it is.

20    Q.   Now, you indicated that you had worked with

21  the Sony DDM for about 15 years.  Was that periodically,

22  month to month, did you see one once a week?  How -- how

23  frequently were you working on Sony DDMs over that

24  15-year period?

25    A.   I would say most of that time, it was on a

1   daily basis.

2        Q.   And did you own any Sony DDM monitors?

3        A.   I owned three of them.

4        Q.   And you indicated developing the graphics

5   controllers.  How many different graphics controllers

6   did you design for the Sony DDM?

7        A.   Over that period of time, I think I counted up

8   that I designed something like six different graphics

9   controllers specifically for that unit.

10       Q.   And did that graphics controller -- was that

11  designed to drive any other displays?

12       A.   No.  It was -- this monitor at that time was

13  unique.  Sony was the only one producing a -- a

14  2,000-line color monitor.  And so those graphics

15  controllers had no other purpose in life but other than

16  to drive that exact monitor.

17       Q.   Now, we heard Mr. Lesh testify the other day

18  that Sony had sold 5,000 DDM monitors in the United

19  States.  Do you know how many of your graphics

20  controllers for Sony DDM monitors were sold?

21       A.   Yes, sir.  Went back and looked at the

22  records, and I think I can say that we produced

23  something like 4300 graphics controllers for that

24  monitor.

25       Q.   Did you sell any of your controllers to the

 1  FAA?

 2      A.   Yes, sir.  That was our biggest customer.

 3      Q.   So based upon your extensive knowledge of the

 4  Sony DDM, were there any puzzle pieces, so to speak,

 5  missing from the Sony DDM with respect to the asserted

 6  claims?

 7      A.   Yes, sir, a couple of them.  First is the

 8  communications controller, and I believe if you look at

 9  the slide that --

10              MR. PLIES:  Tracy?

11      A.   -- Mr. Eccles drew, if you look over here in

12  this drawing, the computer over here has this interface

13  over to what he calls a USART, which is based on the

14  same -- as a UART in this instance, and that

15  communications channel is another one like Mr. Webbs'

16  that was a point-to-point.

17          In other words, it's the only thing that

18  can -- it can come from here, and it only goes to here

19  (indicates).  There's nothing going on where it has to

20  figure out which monitor it's talking to, you know, out

21  of a group of them or even which device within the

22  monitor that it might be talking to.

23          So there's no device addressing going on, like

24  an I2C bus or anything like that.

25      Q.   (By Mr. Plies) Now, did you hear Mr. Eccles

1  identify that USART -- used the term communication

2  controller when he testified?

3      A.   Right.  I think it was -- again, it was

4  basically just a UART.  It was not a communications

5  controller.

6      Q.   Now, have you reviewed Mr. Eccles' article on

7  the Sony DDM?

8      A.   Yes, I have.

9      Q.   And have you reviewed Mr. Malden's articles on

10  the Sony DDM?

11      A.   Yes, all of them.

12      Q.   Have you reviewed technical documents on the

13  Sony DDM?

14      A.   Yes, I have.

15      Q.   And in any of that documentation did you see

16  any reference to that USART being called a communication

17  controller?

18      A.   Yes, sir.

19      Q.   Now, I was going to ask you, after listening

20  to the witnesses earlier this week talk about the Sony

21  DDM, which you worked on on a daily basis for 15 years,

22  did anything surprise you about the testimony you heard?

23      A.   Well, I heard about a secret serial number for

24  the first time, and I must say that Sony was very good

25  at keeping secrets, because I never knew about it.

1      Q.    Were you aware of the user area in the memory?

2      A.    Yes, I was aware of the user area.  That is

3    described in the interface manual.

4      Q.    And did anything else surprise you that was

5    talked about concerning the Sony DDM?

6      A.    Well, I think the -- there was an implication

7    that this was a plug-and-play unit, and I think nothing

8    can be further from the truth.

9      Q.    And why do you say that?

10      A.    Well, the graphics controller to drive this

11    unit is not an easy product to design.  The requirements

12    for driving this monitor are very, very stringent.  The

13    video clock rate on this thing has to be 357.181

14    megahertz, nothing more, nothing less.

15            The horizontal frequency has to be 128

16    kilohertz.  And the vertical frequency has to be 60

17    hertz.  And if you drive it with any other signals, you

18    don't get a picture on the screen.

19            And so the idea that the graphics controller

20    would somehow configure itself in the field, you know,

21    based on something it read out of the monitor is just --

22    doesn't happen.

23      Q.    And, again, you indicated that you designed

24    the graphics controllers that drive these monitors,

25    correct?

1    A.    Yeah.   Those numbers are well engrained.   I'll

2 probably go to the grave remembering those numbers.

3    Q.    And what would your graphics controllers have

4 done if they had received an ID number or frequency data

5 that was sent to -- from the Sony DDM?

6    A.    Well, we had nothing to do -- I mean, there

7 was just no need for that information.

8    Q.    To your knowledge, did the FAA ever require ID

9 numbers to be put in the memory?

10    A.    No, sir.

11    Q.    Did anyone ever tell you that your display

12 adapter needed to be able to receive ID signals or

13 frequency data and use that kind of information from the

14 Sony DDM monitor?

15    A.    No, sir.

16    Q.    Now, you indicated earlier that you --

17         MR. PLIES:   I'm sorry.   Strike that.

18    Q.    (By Mr. Plies) I believe Mr. Lesh had shown an

19 exhibit when he was testifying that actually showed that

20 you had took his training class.

21         Do you recall that?

22    A.    Yes.   I was -- you know, I wasn't exactly sure

23 when I had done that, but I believe he -- his slide

24 indicated that I was something like the seventh student

25 to have ever taken his class, and that was in, I

1  believe, 1989.

2      Q.   And while you were working on the Sony DDM,

3  did you actually receive technical documentation from

4  Sony to enable you to do your work?

5      A.   Yes.  That was necessary for us to be able to

6  do the kind of work that we were doing.

7      Q.   And was some of that documentation some of the

8  documentation that we've seen exhibited?

9      A.   Yes.  Basically consisted of -- they had a

10  thing called a service manual, which was all of the

11  internal operational characteristics.  There were also

12  some other user kind of information.

13          And then finally, the big piece that really

14  helped us understand that unit even more was the -- what

15  they call the interface manual.

16      Q.   And were any conditions placed on you for

17  receiving such technical documents from Sony?

18      A.   Yes, sir.  I was required to sign a

19  nondisclosure agreement to be able to get a copy of that

20  information.

21      Q.   Now, we've heard a lot over the last few days

22  about storing an ID number or a serial number in the

23  memory of a monitor.  Is storing an identification

24  number in a memory the '090 invention?

25      A.   No.  The '090 invention is much bigger than

1   that.

2       Q.   If you could, what would -- how would you

3   characterize the '090 invention?

4       A.   Well, the '090 invention is basically plug and

5   play.  All the things that a host computer would need to

6   know to be able to configure the best possible picture

7   for the screen.

8       Q.   And we talked about the EDID standard when you

9   were on the stand before.  What kind of information does

10  that include?

11      A.   It includes things like the identification

12  information, the characteristic information, like the

13  timing data; it includes function, type, serial number,

14  number of other fields.

15      Q.   Have you seen any evidence to indicate that

16  the Patent Office agrees with you that the '090

17  invention is not simply limited to a monitor storing an

18  ID number?

19      A.   Yes.  I think Dr. Rhyne talked about the Mogi

20  patent and showed some of the things that -- in fact,

21  the Mogi reference talked about putting a serial number

22  and, I think, ID and so forth in a monitor.

23          But the Patent Office looked at that, I

24  believe on three occasions -- and it's even on the very

25  first issuance of the '090 patent -- and looked at that

1  very carefully and decided that nothing in the Mogi

2  reference would invalidate the patents.

3       Q.   Let's talk about the third reference, Sawdon.

4  Does Sawdon render any of the claims invalid?

5       A.   No, sir.

6       Q.   Does it render any of the '090 claims

7  anticipated?

8       A.   No, sir.

9       Q.   Does it render any of the '090 claims obvious?

10      A.   No, sir.

11      Q.   Was Sawdon missing any of the puzzle pieces?

12      A.   Yes, it was.  It was missing the

13  identification information and --

14           MR. PLIES:  Tracy, if we could put up

15  DX327.  And if you'd go to the next page and one more,

16  another page.  And if you could go to the top and

17  highlight on the right-hand column where it says, around

18  Line 9:  Control data being unique to the display

19  device.

20      Q.   (By Mr. Plies) And do you recall Dr. Rhyne

21  yesterday indicating that this passage indicated that

22  the -- there was information in identifying the display

23  unit?

24      A.   I remember him characterizing it that way,

25  yes.

1    Q.   And in your opinion, is this information that

2  identifies the display unit?

3    A.   No, sir.  If you actually just go down a few

4  lines, I believe it's maybe down around Line 21 or

5  something like that, they further define this -- I may

6  be wrong on that reference, but, anyway, the -- these --

7  this quote/unquote unique information is termed to be

8  more characteristic information.

9        Basically timing data is what they're really

10  talking about with this patent.  And if you look at the,

11  you know, the stated goal of this patent, it's -- it is

12  basically characteristic information.

13        MR. PLIES:  Tracy, if you could highlight

14  Line 22 and 23.

15    Q.   (By Mr. Plies) Mr. Lamm, you indicated the

16  word timing.  Is this the timing that you're referring

17  to?

18    A.   Yeah, there it is.  The control data basically

19  is the signal timing requirements, and that's what I was

20  referring to.

21    Q.   Now, Mr. Lamm, on the '090 patent, which has

22  undergone re-examination, did you have an opportunity to

23  count up all the various prior art that was considered

24  by the Patent Office in issuing the '090 patent and its

25  re-exam certificate?

1     A.   Yes, sir.  I counted up all of the patents

2  that the Patent Office has looked at, and all of the --

3  the U.S. patents, I've counted up all the foreign

4  patents that the Patent Office looked at and counted up

5  all of the technical articles and published information

6  that the Patent Office had looked at, and it comes up to

7  401 different pieces of prior art that they looked at

8  once -- you know, in the process of the -- of proving

9  the validity of this patent.

10     Q.   All right.  Mr. Lamm, the Judge is going to

11  instruct the jury, hopefully in a few hours, on the law

12  with respect to validity, but do you have an

13  understanding of certain non-technical factors that are

14  relevant to non-obviousness?

15     A.   Yes, sir, I do.

16          MR. PLIES:  And, Tracy, can we put up

17  that slide, please?

18     Q.   (By Mr. Plies) And can you please describe

19  what you're showing here in the first major bullet for

20  the jury.

21     A.   Yeah.  There's a couple of things that factor

22  into non-obviousness, and one of them is the commercial

23  success of the patent family.  And basically what

24  they're looking at is:  Is the patented technology

25  widely implemented?

1          And I think we've seen examples that the logo

2   program requires you to -- to practice these patents and

3   that there are standards for it.  The plug-and-play

4   standard, the EDID standard, the EDDC standard all

5   incorporate these patents.

6          And the fact that the Defendants' customers

7   have said:  We've got to have it.  We have to have the

8   plug and play and EDID.  And, therefore, the commercial

9   success of these things is basically due to the

10  invention.

11         Now, it's -- it's actually hard to find units

12  to compare with this, because everybody's got it, and if

13  you didn't have it, you would be relegated to very niche

14  market applications that -- you know, certainly not the

15  broad monitor marketplace.

16    Q.   Now, what's the factor indicated in the third

17  major bullet?

18    A.   Well, the other factor for obviousness is --

19  or for non-obviousness is:  Is there an industry respect

20  for these patents?

21         And one of the -- you know, the big factor

22  here is:  Have they been licensing it to other

23  companies, and have they been widely licensed?

24  And I think we can certainly all appreciate that when 17

25  of the 19 companies in the business have already taken a

1 license, they would certainly be widely licensed, and --

2 and those licenses account for quite a bit of money.

3     Q.   Okay.  Mr. Lamm, so let me just wrap this up.

4 In conclusion, what is your opinion as to the validity

5 of the asserted '090 claims?

6     A.   That all of the claims that are asserted are

7 valid.

8          MR. PLIES:  Thank you.

9               CROSS-EXAMINATION

10 BY MR. BROGAN:

11     Q.   Mr. Lamm, how are you today?

12     A.   Great.  How are you?

13     Q.   I'm good.

14          You talked there for a minute about the PTO

15 and a lot of information that the PTO's considered,

16 right?

17     A.   Yes, sir.

18     Q.   And sort of gave me the impression that you

19 think that the PTO is -- had access to everything that's

20 relevant and actually considered everything that's

21 relevant.  Is that kind of what you're saying?

22     A.   Yes, I believe so.

23     Q.   Okay.  Now, I got to be honest, I woke up in

24 the middle of the night last night thinking that very

25 same thing, and it made me start thinking about that

1  NIRC that Mr. Black talked about yesterday, that --

2  what's it called -- the notice of intent to issue

3  re-examination certificate.

4          And as I started thinking about that,

5  something hit me.  It got me out of bed.  And -- and I

6  went and I got out my notebooks, and I took a look at

7  that thing, and, you know, I found something kind of --

8  some things kind of interesting to me, and I'd like to

9  walk through some of those with you.

10      A.   Okay.

11          MR. BROGAN:  Bryan, can you bring up

12  that -- what we call that '090 IDS thing?

13          All right.  And, Bryan, can you go --

14  just right here on the front page right here, can you

15  go -- highlight patent number there for everybody?

16      Q.   (By Mr. Brogan) All right.  So this is an

17  office action that, you know, in the ex parte

18  examination that deals with the '090 patent, right?

19      A.   Yes.

20      Q.   Okay.

21          MR. BROGAN:  Bryan, can you go to Page 3?

22      Q.   (By Mr. Brogan) And up at the top here, this

23  is -- at the very, very top.

24          MR. BROGAN:  Right there at the very top.

25      Q.   (By Mr. Brogan) See that?  That's the notice

1  of intent to issue ex parte re-examination certificate,

2  right?

3      A.   Yes.

4      Q.   Okay.  And it's -- if we go over, it was

5  issued by Examiner -- Christopher E. Lee, right?

6      A.   Yes, sir.

7      Q.   Okay.  And here, I think, if we go down a

8  little, it says:  The patent claims that are confirmed

9  are Claims 1 through 4, right?  Up kind of here.

10     A.   Yes, sir.

11     Q.   And then it says -- down on No. 4, there's a

12 box that's checked, and it says:  Note attached list of

13 references cited, you know, PTO.

14          Do you see that?

15     A.   Yes, sir.

16     Q.   That kind of jumped out at me as something

17 interesting, and we're going to get to that, but --

18              MR. BROGAN:  Bryan, take me to your

19 notation 8 on this, if you would.

20              No.  Page 8, your 8, just 8.

21              All right.  Now, up here, starts:  With

22 respect to.  That paragraph right there:  With respect

23 to.

24     Q.   (By Mr. Brogan) Now, here -- and I'm going to

25 read this for the jury.  It says:  With respect to

1  Claims 1 to 26, it is noted that the claim limitations

2  of the respective claims, 1 and 3, are deemed patentable

3  over the prior art of record having raised substantially

4  any questions of patentability as the prior art fails to

5  teach or suggest that said display unit information

6  includes -- and here it is -- an identification number

7  for uniquely identifying a display unit.

8         Do you see that?

9     A.   Yes, sir.

10    Q.   Okay.  Now, in your report, you've told us and

11 others that that -- an identification number for

12 uniquely identifying the display unit, that could be a

13 serial number, right?

14    A.   Yes, sir.

15    Q.   Okay.  Now, you heard Mr. Webb testify that

16 his system included a serial number, right?

17    A.   Yes, I heard him say that.

18    Q.   All right.  And you saw documents from

19 Mr. Webb that confirmed that he could read a serial

20 number out of his system, right?

21    A.   Through the --

22    Q.   Yeah.  Through the --

23    A.   Through the port, yeah.

24    Q.   -- this port right here (indicates) that you

25 were talking about, right?

1     A.   Yes, sir.

2     Q.   Okay.  And he called that a communication

3  controller, right?

4     A.   Yes.

5     Q.   Okay.  Now, if we go back here --

6          MR. BROGAN:  Bryan, go to the next page,

7  9, and just go to that signature block.

8     Q.   (By Mr. Brogan) That's -- that's Christopher

9  E. Lee again, right?

10     A.   Yes, sir.

11     Q.   So initials C.E.L.?

12     A.   Yes.

13     Q.   Okay.  Now, let's --

14          MR. BROGAN:  Bryan, let's go to Page 13,

15  if you would.  Actually, go to -- go to -- no.  Go to

16  Page 15.  Go to Page 15.

17          Okay.  And go to the very bottom there,

18  very bottom there.  All right.  And highlight that and

19  bring that up for the jury.

20     Q.   (By Mr. Brogan) Now, this is what woke me up

21  in the middle of the night.  This says:  All references

22  considered except where lined through.

23          Do you see that?

24     A.   Yes, I do.

25     Q.   Okay.  And that would mean that if a reference

1  is on here and it's not lined through, then Examiner

2  Lee, who's got his initials here, C.E.L., then he

3  considered it, right?

4      A.   I guess that's what that means.

5      Q.   Okay.

6           MR. BROGAN:   So, Bryan, go up on the

7  page, go up a little bit higher, and you'll see the --

8  the -- here it is right up here.

9      Q.   (By Mr. Brogan) There's a patent.  That's Mr.

10  Webb's patent there right, right?

11     A.   Yes.

12     Q.   Okay.  And it's not lined through.  And so it

13  means that, you know, Examiner Lee, he considered

14  Mr. Webb's patent, right?

15     A.   Yes.

16     Q.   Okay.  And you've considered Mr. Webb's patent

17  as well, right?

18     A.   Yes, I have.

19     Q.   Okay.  Now, Mr. Webb's patent doesn't talk

20  about storing a serial number in this memory, does it?

21  His patent doesn't do that, does it?

22     A.   I don't recall seeing that in there, so no.

23     Q.   Okay.  So you wouldn't find this information

24  in his patent, would you?

25     A.   No.

1          Q.    Okay.

2                MR. BROGAN:  Now, Bryan, if you'd take me

3   to Page 44.  Go up here at the top, right up there,

4   right -- right there.  Next one up.  Next one up.  Those

5   two guys, yeah.  And bring that up.  Bring that up.

6   That's really, really important.  Okay.  Bring it up and

7   highlight it for the jury.

8          Q.    (By Mr. Brogan) Now, right here it says:  The

9   PTO had access to Mr. Webb's declaration, right?  You

10  know, his declaration setting forth his story about what

11  happened, right?

12         A.    Yes.

13         Q.    Okay.  And it's got -- it's got a strike

14  through it, doesn't it?

15         A.    Yes, it does.

16         Q.    Okay.  And based on, you know, the -- the

17  notation that Examiner Lee provided for us, that means

18  that Examiner Lee didn't consider Mr. Webb's

19  declaration, doesn't it?

20         A.    I would have to assume that's what that means.

21         Q.    Okay.  And so what that means is that

22  Mr. Webb's testimony wasn't considered by the Patent

23  Office, doesn't it?  That's what that means, doesn't it?

24         A.    I guess so.

25         Q.    And so that means that this jury sitting right

 1  here is the first group that really gets to hear his

 2  testimony, doesn't that, sir?

 3      A.   I guess so.

 4      Q.   All right.  Now -- oh, yeah, let's -- just

 5  go -- that thing right under -- right under Mr. Webb, it

 6  says:  Development proposal for multisync monitors,

 7  Webb, blah, blah, blah.  So that's another one of

 8  Mr. Webb's technical documents that wasn't considered,

 9  right?

10      A.   By Mr. Lee.

11      Q.   Right.  And -- and so he -- at the PTO, in

12  this re-examination proceeding you've been talking

13  about, he axed through it and said that he didn't

14  consider it, right?

15      A.   Correct.

16      Q.   Right.  And there's a reason at the PTO why,

17  you know, Mr. Lee wouldn't have done this.  It's not

18  that he's doing anything wrong.  It's just their

19  procedures say that in a re-exam, you can only consider

20  patents and printed publications, right?

21      A.   I believe I heard Dr. Rhyne say that.

22      Q.   Okay.  And that's -- that's what's set forth

23  in the MPEP, right?

24      A.   Yes.

25      Q.   Okay.  And so, you know, if -- if Mr. Webb's

1 declaration isn't a patent or printed publication, the

2 PTO rules say that the PTO can't, you know, consider

3 that, right?

4     A.   Okay.

5     Q.   And it means that these folks have to consider

6 it.  That's the only place we can go to really get this

7 considered, right?

8     A.   Okay.

9     Q.   All right.

10          MR. BROGAN:  Bryan, go down the page a

11 little bit down towards the bottom.  Yeah, down here.

12 Preliminary Development Agreement, Sampo monitor --

13 Samsung 20-inch -- 21-inch monitor.

14     Q.   (By Mr. Brogan) All right.  Now, this is the

15 monitor that -- that Mr. Webb testified that he built,

16 created in 1989, and he sold to Sampo -- Samsung, right?

17     A.   I believe that was his -- Samsung and

18 basically to Sony, also.

19     Q.   Right.  And now, down here he's got -- it

20 says:  Preliminary Development Agreement prepared for

21 Display Labs.  He did that with Samsung.

22          Down here, the 21-inch monitor that he built

23 for Samsung right there, that -- that information wasn't

24 considered.  The system that he built for Samsung, as

25 shown by Examiner Lee's own initials and his own work,

1   wasn't considered at the PTO on this re-exam, was it,

2   sir?

3        A.   I guess not.

4        Q.   And, again, that means that this jury sitting

5   right here is the group that has to consider what it was

6   that he really didn't; isn't that -- isn't that right?

7        A.   Correct.

8        Q.   All right.  Now, y'all have taken a fair

9   amount of time to talk about, you know, the DDM

10  materials being considered by the PTO and kind of played

11  that up, right?

12       A.   We've identified a few items, yes.

13       Q.   Okay.  You've talked about that.

14            MR. BROGAN:  Let's go over to Page 45

15  there, Bryan.  And starting right about here

16  (indicates), highlight all that for our jurors, please,

17  and bring that up.

18       Q.   (By Mr. Brogan)  Now, at the very top of this

19  list, very top entry, sir, what does that say?

20       A.   The Sony DDM Monitor Interface Manual, Third

21  Edition.

22       Q.   Okay.  Now, that's -- that's the interface

23  manual from Sony that talks about the DDM being able to

24  receive instructions to get information out of its

25  memory and send that stuff back, right?

1    A.    It's the calibration interface primarily, but

2 yes.

3    Q.    It talks about communications interface, tells

4 people how to interface with that monitor?

5    A.    Correct.

6    Q.    All right.  And that's the one that talks

7 about the acknowledgement signals and the reception

8 confirmation signals, stuff like that?

9    A.    Correct.

10    Q.    All right.  And it does -- that's a model that

11 tells you that you could out of -- well, here let me get

12 this.  That's -- that's the manual that tells you that

13 you can upload and download entire files into and out of

14 this memory, right?

15    A.    Correct.

16    Q.    Using this computer over here, you can send

17 information over, ask for the file, whole file, all the

18 display settings, pull them all back over to the

19 computer, right?

20    A.    Correct.

21    Q.    Okay.  And if you wanted to, you could upload

22 it back again?

23    A.    Yes.

24    Q.    Okay.  Now, that -- not considered by the PTO,

25 right?

1      A.   It has a line through it.

2      Q.   Couldn't do it because it's not -- this system

3  wasn't a patented -- patent that was there and it wasn't

4  a printed publication there, so he's -- he's doing what

5  he can, it means -- what's that mean, again, sir?  It

6  means that this jury is the only place where we can

7  actually have this considered, right?  That's what it

8  means, right?

9      A.   I'm not sure I know the patent procedures well

10  enough to be able to -- to really comment on that.

11      Q.   Okay.  All right.  But you agree with me that

12  at least on re-exam, the PTO didn't consider this

13  interface manual, right?

14      A.   Well, Mr. Lee said that he didn't.

15      Q.   Okay.  And -- and he was the one that ran this

16  re-exam, right, on the '090 patent?

17      A.   He signed off on it eventually.

18      Q.   Yeah.  He's the guy that issued that -- that

19  NIRC.  And his -- his reasons for issuing that NIRC were

20  that, again, nobody had a serial number, right?  That's

21  what he said?

22      A.   That was a statement that he put in the

23  document, yes, sir.

24      Q.   Okay.  So from our -- from our perspective,

25  the PTO has not yet considered the full story here, has

1  it, sir?  It hasn't heard and considered all of Mr.

2  Webb's testimony, has it?

3       A.   I don't think I can make that judgment of --

4  of what the PTO actually did.

5       Q.   Okay.  All right.  Now, when -- when I took

6  your deposition in this matter, you remember that back

7  in -- I think it was -- where were we?  Oh, we were in

8  Austin, right?

9       A.   Yes, sir.

10      Q.   Right.  And I asked you a question about Mr.

11  Webb, I actually asked you a couple of them, right?

12      A.   Yeah, he came up quite a bit.

13      Q.   Yeah, right.  I asked -- and one of the

14  questions I asked you was do you think he's an honest

15  guy, right, I asked you that question?

16      A.   Yes, sir.

17      Q.   Okay.  And your response was, yeah, I have no

18  reason -- no reason doubt that, right?

19      A.   Yeah, and I would state -- say that today.

20      Q.   All right.  And -- and I also -- and I -- and

21  I went further with you, we talked a little bit more

22  about him and I said, you -- I said:  What do you think

23  Mr. Webb; I asked you that question, right?

24      A.   Yes, sir.

25      Q.   Okay.  And -- and you said, I think he's an

1  extremely capable design engineer.  Right, you said

2  that?

3       A.   Yes.

4       Q.   Okay.  And then you went on and you said, I've

5  paid him a lot of money over the years to -- to tap into

6  that expertise, right?

7       A.   Yes, sir.

8       Q.   You did say that.  Okay.  And then you went on

9  and -- and you got to another sentence, which I think is

10 really important for this jury, and it's --

11            THE COURT:  Well, Mr. Brogan, why don't

12 we use the deposition, probably just ask him the

13 questions --

14            MR. BROGAN:  All right.

15            THE COURT:   -- you know.  We're not here

16 to listen to you read.  I mean, you can ask him.  If he

17 says --

18            MR. BROGAN:  Okay.

19            THE COURT:   -- something different,

20 then --

21            MR. BROGAN:  Okay.

22            THE COURT:   -- you can say didn't you

23 say something different, but --

24       Q.   (By Mr. Brogan)  Okay.  Did you -- did you

25 say, sir, that certainly with respect to CRTs, I don't

1  think you find anybody that knew anything more about

2  CRTs in the country than he does?

3       A.   Yes, I did say that.

4       Q.   All right.  Now, that same fellow, he says

5  that that's a communication controller, right?  He said

6  that this -- this UART works with his processor in the

7  logic that two of them together, they act as a

8  communication controller; is that right?

9       A.   That was his testimony, yes.

10      Q.   That -- that was his testimony.  Okay.

11            MR. BROGAN:  Now Bryan, I'm going to --

12  I'm going to jump to those documents that we found that

13  relate to communication controllers; do you remember

14  those?  And -- and can you go to No. 1, to the front

15  page of that?  And just put up the title there.

16      Q.   This is an article or -- that we found about

17  prototyping hardware and software environment for

18  teaching digital circuit design; do you see that?

19      A.   I see that.

20      Q.   All right.

21            MR. BROGAN:   Now -- now Bryan, take me

22  to what's, I think, Page 375 of this article.  And 375.

23  And then it says where it starts the communication

24  controller, could you highlight that for the jury,

25  please?

```
 1                    MR. PLIES:  Your Honor?

 2                    THE COURT:  Yes.

 3                    MR. PLIES:  Can we approach?

 4                    THE COURT:  Yeah.

 5                    (Bench conference.)

 6                    MR. PLIES:  It's possible I'm mistaken,

 7    but I don't believe this is either in evidence, and I

 8    don't believe we've got it as a demonstrative.

 9                    MR. BROGAN:  He says that's a

10    communication controller.  He said that.  This is

11    cross-examination and cause his --

12                    THE COURT:  I understand.  What predicate

13    have you laid to throw that document up there?

14                    MR. PLIES:  It's not in Rhyne's report.

15                    THE COURT:  What predicate have you laid

16    to throw that document on the screen?

17                    MR. BROGAN:  I didn't, Your Honor.

18                    THE COURT:  Well, you know, I don't know

19    if anybody recognizes when it says it's authoritative or

20    anything.  So let's keep it down.

21                    MR. BROGAN:  Thank you, Your Honor.

22                    (Bench conference concluded.)

23        Q.   (By Mr. Brogan) Let me -- let me just to be

24    clear just so we're here, with respect to the systems

25    that Mr. Webb designed and built and invested his life's
```

 1  efforts in, who do you think knows more about this, him

 2  or you?

 3      A.   Well, can I answer that other than a yes or no

 4  answer?

 5           THE COURT:  Well, if you can't answer it

 6  in a yes or no, then you can --

 7           THE WITNESS:  Okay.

 8           THE COURT:  If you say you can't, then

 9  you -- you don't have to do something that you think is

10  not truthful.

11           THE WITNESS:  Okay.

12      A.   Mr. Webb's expertise is over in the deflection

13  and video circuits.  I believe we saw contracts from

14  where Mr. Webb hired another individual to design the

15  code and the area around the processor.

16           There was some contracts that I -- that I

17  reviewed where, for whatever reason, he needed help with

18  that piece.  And so I can probably point to the pieces

19  where -- that were Mr. Webb's expertise and that's, you

20  know, basically the CRT, the driver circuit up here, the

21  video circuit, and so forth.  And he certainly knew what

22  needed to be done down here, but he had to rely on

23  somebody else to actually do that piece of it for him.

24      Q.   (By Mr. Brogan)  So that's -- that's your view

25  of it.  Your view of it isn't that -- that he created

1  this MIMIC controller that solved all those problems

2  that allowed these circuits to be adjusted using this

3  computer?  That -- that's not your understanding of what

4  he told the jury?

5      A.   Well, the -- the MIMIC circuit is really this

6  stuff up here.  It's the -- it's the pieces that control

7  this.  There was still a microprocessor in there that

8  talked to that -- to that MIMIC IC.

9           MR. BROGAN:  Bryan, can you pull up DX

10  353-006?

11     Q.   (By Mr. Brogan)  And this is -- this is, you

12  know, Display Labs' technical manual for their 19-inch

13  microcomputer controlled color monitor, right --

14     A.   Correct.

15     Q.   -- if we look at the front page?  And now if

16  you go to this -- this page right here, that big chunk

17  right over here, the CPU and all that stuff, that's what

18  Mr. Webb spent so much time talking about right here,

19  isn't it, sir?

20     A.   Yes, sir.

21     Q.   Okay.  Now, in this case a patent claim is not

22  valid if it covers something that was sold more than a

23  year prior to the patent filing date, right?

24     A.   I'm sorry, could you repeat that, please?

25     Q.   You -- you would -- would you agree with me

1  that if -- if a patent in, we'll call it 1992, a

2  patent -- patent application filed in 1992, okay?  If

3  that patent covers a system that was sold in the United

4  States in 1989, then that patent claim would not be

5  valid, right?

6      A.   I believe that's my understanding.

7      Q.   Okay.  Now, in this case, Mr. Webb has

8  testified that he sold his monitors to Samsung in 1989,

9  right?

10     A.   Yes, I heard that.

11     Q.   Okay.  And he testified that he sold some more

12  to Sony in 1992, right?

13     A.   Yes.

14     Q.   Okay.

15          MR. BROGAN:  Bryan, can you bring up

16  038-01?

17     Q.   (By Mr. Brogan)  So -- so if we're looking at

18  that, we've got the earliest filing date of the '090

19  family up here in red, right?

20     A.   Correct.

21     Q.   Okay.  And -- and back here in 2/90 you got

22  the sale of his 21-inch monitor to Samsung.  In '92 we

23  got this sale of this monitor to Sony, right?

24     A.   Correct.

25     Q.   Okay.  So if the patent claims in the '090

1  patent family cover the system that Mr. Webb sold to

2  Sony and sold to Samsung on those days, then -- then

3  those claims wouldn't be valid, right?

4       A.   Correct.

5       Q.   You'd agree with that?  Okay.  Now --

6            MR. BROGAN:  You can put that down,

7  Bryan.

8       Q.   (By Mr. Brogan)  And so if -- if this jury

9  were to find that the claims of the '090 patent cover

10  this system that was sold by Jim Webb to Samsung in

11  1989, then it should find that those claims are not

12  valid, right?

13      A.   Correct.

14      Q.   Okay.  And you spent some time talking about

15  commercial success, right?  I heard that when you were

16  on the stand.

17      A.   Yes, sir.

18      Q.   Okay.  And that's -- that's an idea that

19  applies to an obviousness analysis, right?

20      A.   Correct.

21      Q.   Okay.  Where you're combining, you know,

22  things together and putting them together, right?  Now,

23  Dr. Rhyne testified yesterday that with respect to Webb,

24  we're not talking about an obviousness analysis, didn't

25  he?

1      A.   I don't believe he did.

2      Q.   Okay.  He -- he said that they were talking

3  about an anticipation analysis, right?

4      A.   Yes.

5      Q.   Okay.  And in an anticipation analysis, what

6  has to be done is that this jury has to figure out

7  whether what's in this monitor matches up with what's in

8  those claims in the '090 patent family, right?

9      A.   That's my understanding.

10      Q.   That's what has to be done.  And commercial

11  success has nothing to do with that analysis, right?

12      A.   Correct.

13      Q.   All right.  Nor would any extensive licensing

14  that you've talked about have anything to do with that

15  analysis, right?

16      A.   I would believe that.

17      Q.   All right.  What the jury has to do is it's

18  got to go back there and it's got to look at the claims

19  of these patents and it's got to look at Jim Webb's

20  system and it's got to figure out whether the claims

21  require you to have a CRT in some claims, right?  And

22  it -- and it's got to figure out whether you've got to

23  have a processor.  It's got to figure out whether you

24  got -- whether you've got memory.

25          And they got to figure out whether you --

1   whether Mr. Webb actually, you know, whether he stored

2   this stuff, whether his monitor was designed to do this

3   stuff, right?  And if they go through those claims and

4   they check all those boxes, like Dr. Rhyne did, then

5   that would mean that those patent claims aren't valid,

6   right?

7        A.   Correct.

8        Q.   All right.

9             MR. BROGAN:  Your Honor, that's all the

10   questions I have for this witness.

11                   REDIRECT EXAMINATION

12   BY MR. PLIES:

13        Q.   Just a few questions.  Mr. Lamm, first of all,

14   Mr. Brogan showed you where the Patent Office had lined

15   out certain pieces of paper that had been submitted,

16   including Mr. Webb's declaration and some -- some of Mr.

17   Webb's documents; do you recall that?

18        A.   I recall that.

19        Q.   Isn't it possible that when the examiner lined

20   out the Webb declaration and those Webb documents, that

21   the examiner did not consider them to be prior art?

22        A.   I'm not familiar with the procedures of the

23   Patent Office, so I -- I really don't fully appreciate

24   what the lining out means.

25        Q.   Fair enough.  Let's talk about Mr. Webb a

1  little bit.  How long have you known Mr. Webb?

2      A.   I first met Mr. Webb in 1981 or '2, something

3  like that.

4      Q.   And did you actually work on some display

5  projects together?

6      A.   Quite a few.

7      Q.   Did he actually assist you in your company in

8  some projects?

9      A.   Yes.

10      Q.   And why did you bring Mr. Webb in to help you?

11      A.   Because he had the expertise in the deflection

12  and video circuitry that I didn't have, so I needed

13  his -- I needed his help.

14      Q.   Now, did you also work on that project with

15  him?

16      A.   Yes.

17      Q.   And what aspects of the projects were you

18  responsible for?

19      A.   This -- well, the first one that I called Mr.

20  Webb in on was a design where we wanted to not only just

21  have a CRT display, but we wanted to run a digital

22  signal all the way up to as close to the video circuit

23  in the monitor as we could.  So we actually created

24  added a digital interface, and I did all that and

25  basically built the D to A converter that we attached on

1  a little circuit board that we attached to the actual

2  neck of the CRT computer, basically the -- I'm sorry,

3  the neck of the CRT, it's little -- right here.

4         We didn't want anything in the way in the way

5  or, you know, any transmission circuits or, you know,

6  capacitance to build up and -- and degrade the picture.

7  So getting right to the video amplifier was my part and

8  then he took it from there and then also did all the

9  deflection circuitry.

10      Q.   Okay.  I'm sorry, could -- could you use the

11  laser and -- again and show, using this as an example,

12  which part were you responsible for and which part was

13  Mr. Webb responsible for?

14      A.   Okay.  I was responsible for getting the

15  signal -- generating the signal in the computer and

16  getting it all the way into this card in a digital form.

17  At that time everybody else was doing it in analog form.

18      Q.   So is it fair to say that your responsibility

19  was undoing the interfacing and the signaling and his

20  responsibility was essentially for the picture tube

21  itself?

22      A.   For the picture tube and the deflection

23  circuitry and that video amplifier that's sitting over

24  here.  CRTs of this day were, and I guess still are,

25  pretty difficult to -- to drive or to generate those

1  signals properly.

2      Q.    And the -- I'm sorry.

3      A.    And that was his expertise.

4      Q.    Okay.   And the patents that are in suit here,

5  do they do with the -- deal with the CRTs in which Mr.

6  Webb has -- has -- has experience in or do they deal

7  with the interfacing between the computer and the

8  display?

9      A.    The claims that have been asserted basically

10  all deal with this communications down here between the

11  PC and the -- and the display controller.

12              MR. PLIES:   All right.   Thank you, Mr.

13  Lamm.

14              THE WITNESS:   Thank you.

15              MR. BROGAN:   I have no further questions,

16  Your Honor.

17              THE COURT:   All right.   You may step

18  down.

19              THE WITNESS:   Thank you.

20              THE COURT:   Ladies and gentlemen, we'll

21  go ahead we've already had one break we're going to take

22  a 15 minute break.   Be back at a quarter till.   Quarter

23  till.

24              (Jury out.)

25              THE COURT:   All right.   Court's in recess

 1  until 10:45.  I'll see counsel.

 2                    (Bench conference.)

 3                    THE COURT:  You got one more witness?

 4                    MR. BLACK:  Yeah.  How much time do we

 5  have?

 6                    THE COURT:   23 minutes.

 7                    MR. BLACK:   23?

 8                    THE COURT:  Uh-huh.

 9                    MR. BLACK:  I won't even use it all.

10                    THE COURT:  Huh?

11                    MR. BLACK:  I won't even use it all.

12                    THE COURT:  Okay.  Are you going to

13  have any thing?  Are y'all through?

14                    MR. BROGAN:  We're -- we're -- yeah,

15  we've got some cross obviously, but yes, sir.

16                    THE COURT:  Oh, I -- well I understand.

17                    I'm not pushing that hard yet.

18                    Well, as soon as I -- well then, if

19  that's true, then we ought to be through here at 11:30.

20                    You're not going to have any more cross

21  on his direct or -- you're not going to have more cross

22  on his direct, are you?

23                    MR. BROGAN:  Probably not, Your Honor.

24                    THE COURT:  Okay.  Then we'll immediately

25  go in and have an informal charge -- charge conference

1   then at that point.  So y'all -- whoever your charge

2   people are, you can have them in and tell me where your

3   worst heartburn is.

4                    MR. PARKER:  Yes, sir.

5                    MR. BROGAN:  Thank you, Your Honor.

6                    MR. BLACK:  Thank you.

7                    (Recess.)

8                    COURT SECURITY OFFICER:  All rise.

9                    (Jury in.)

10                   THE COURT:  Please be seated.

11                   All right.  Who you got next?

12                   MR. BLACK:  Thank you, Your Honor.

13                   Plaintiffs call Dr. Robert Wedig.

14                   THE COURT:  Come around, Dr. Wedig.

15                   (Witness sworn.)

16                   THE COURT:  Proceed.

17    ROBERT G. WEDIG, Ph.D., PLAINTIFF'S WITNESS, SWORN

18                    DIRECT EXAMINATION

19   BY MR. BLACK:

20      Q.   Dr. Wedig, would you please state your full

21   name for the record?

22      A.   My name is Dr. Robert G. Wedig.

23      Q.   Where did you obtain your doctorate?

24      A.   I obtained by doctorate from Stanford

25   University.

1     Q.    And in what field?

2     A.    In computer engineering.

3     Q.    Are these your qualifications up on the

4  screen?

5     A.    Yes, they are.

6     Q.    Are you aware of any objections to your

7  qualifications to provide evidence in this case?

8     A.    No.

9     Q.    Okay.  We're at the very end of the case here.

10  You are our last witness, and I just want to briefly ask

11  you, were you asked to provide a report in this case?

12     A.    Yes, I was.

13     Q.    Was it in connection with the '812 opinions of

14  Dr. Rhyne?

15     A.    Yes, it was.

16     Q.    Did you review Dr. Rhyne's report?

17     A.    Yes, I did.

18     Q.    Did you provide a rebuttal report to that?

19     A.    Yes, I did.

20     Q.    Did you reach any conclusion with respect to

21  validity in this case?

22     A.    Yes, I did.

23     Q.    What did you conclude?

24     A.    I concluded that based on Dr. Rhyne's report

25  and the art that he cited, that none of the asserted

1  claims are -- are invalid.

2       Q.   Of the '812 family, correct?

3       A.   Of the '812 family, that's correct.

4       Q.   Were you sitting through this trial?

5       A.   Yes, I was.

6       Q.   And has the case narrowed now that we're in

7  our final minutes?

8       A.   Yes, it has.

9       Q.   How has it narrowed?

10      A.   There were significantly more numbers of prior

11 art references that Dr. Rhyne cited, and now he's

12 narrowed it down to basically three different

13 references, the Webb -- the Webb art, the DDM terminal,

14 and the Takahashi patent.

15      Q.   Has anything you heard at trial changed your

16 opinion that the asserted claims of the '812 patent are

17 valid and that the Defendants have failed to meet their

18 burden by clear and convincing evidence?

19      A.   No.  Nothing's changed my opinion.

20      Q.   Thank you, Dr. Wedig.

21            MR. BLACK:  Pass the witness.

22            THE COURT:  Okay.

23            MR. BROGAN:  Actually, Your Honor, I have

24 no further questions.

25            THE COURT:  Pardon?

```
 1                    MR. BROGAN:  I've got no questions.  I'm
 2  good.
 3                    THE COURT:  You may step down.
 4                    THE WITNESS:  Thank you, Your Honor.
 5                    THE COURT:  Anything further?
 6                    MR. BLACK:  We close, Your Honor.
 7                    THE COURT:  Anything from the Defendant,
 8  subject to some documents?
 9                    MR. BROGAN:  Yes, and one offer of proof.
10                    THE COURT:  And an offer of proof.
11                    MR. PARKER:  Before we say the word
12  close, may we approach briefly, Your Honor?
13                    THE COURT:  Certainly.
14                    (Bench conference.)
15                    MR. PARKER:  Just technically before we
16  close, I wanted to make sure we're clear on the record
17  about the timing for the JMOLs --
18                    THE COURT:  Yes.  We agreed on the
19  record.  Now let's get this confirmed, that all JMOLs
20  could be filed after the close of the evidence and be
21  reduced to writing.  I'm going to give you a time frame.
22  But everybody was in agreement --
23                    MR. PARKER:  Yes, sir.
24                    THE COURT:  -- that they would be deemed
25  to be timely filed, right?
```

1          MR. BLACK:  Yes.

2          THE COURT:  From the Plaintiff?

3          MR. BLACK:  Yes, sir.

4          MR. PARKER:  Yes, sir.

5          THE COURT:  Okay.  Yeah.  So we're all

6   clear.

7          MR. PARKER:  We're all clear.  I just

8   wanted to --

9          THE COURT:  I thought we were, but --

10          MR. PARKER:  I just -- I'm just trying to

11   be cautious.

12          THE COURT:  Okay.  I'm going to -- I'm

13   about to excuse the jury.  I'm going to bring them back

14   to -- at 12:30.  That gives us -- we'll go in there --

15   we'll meet at 11:00 o'clock.  We'll have informal charge

16   conference.  I'll make whatever changes I'm going to

17   make and give you another copy.  Then we'll take formal

18   objections.

19          And then we'll have closing arguments.  I

20   understand somebody wants 45 minutes.  Infringement is

21   not at issue.  If y'all spend any of your time on

22   infringement, have at it, but 30 minutes is plenty per

23   side, so...

24          MR. PARKER:  We understand.

25          MS. GUSKE:  Thank you, Your Honor.

1              MR. BLACK:  Thank you.

2              (Bench conference concluded.)

3              THE COURT:  All right.  Ladies and

4    Gentlemen, that is all the evidence that we're going to

5    hear in this case.

6              Now, I have been with -- my staff and I,

7    along with the assistance of Judge Everingham, have been

8    working on this charge that I've got to give you on the

9    law.  That's -- I think we'll have everything ready to

10   start at -- listen to final arguments starting at 12:30.

11   So I'm going to release you until 12:30.  It's a little

12   early lunch.  Be back ready to come in at 12:30.  You'll

13   hear an hour of argument total, 30 minutes from each

14   side, and then I will read you the Court's final

15   instructions.

16             Given the length of what I believe they

17   are, they're about less than half the number of pages we

18   started with, requested.  I think I'm about down to an

19   hour of me talking to you, and then you'll be

20   deliberating.  So, hopefully, by 2:30 -- between 2:30

21   and 3:00, you will receive -- you will be doing your

22   deliberations.

23             So I haven't heard -- you know, I'm just

24   waiting this afternoon as y'all go along as to how long

25   you want to stay.  I told you that I was prepared -- I'd

1  be prepared to stay until -- as long as you want to stay

2  today, if you think you can reach a verdict today.

3  But you don't have to stay into the night.  I'm not

4  telling you that.  I'm just trying to communicate to you

5  that's going to be up to your choice, because I got a

6  kitchen pass from my wife that I can stay out.

7              With those instructions, do not discuss

8  the case, because it's real important that you hear my

9  final instructions before you start discussing the

10  evidence in the case and looking at it.

11             So the pancake is about cooked but not

12  quite, okay?   I'll see you at 12:30.  Thank you.

13             COURT SECURITY OFFICER:  All rise.

14             (Jury out.)

15             THE COURT:  All right.  Counsel, court's

16  going to be in recess for -- I'm going to take

17  objections to the Court's charge after we've had our

18  informal charge conference and made whatever changes I

19  think are -- that I believe need to be made, and then

20  we'll do final arguments.

21             Now, I know that we've got -- only thing

22  we -- do you know what documents you want to take up?

23             MR. BROGAN:  In terms of needing -- yes,

24  Your Honor.  It's --

25             THE COURT:  Everyone be seated, please.

```
 1              MR. BROGAN:  Your Honor, it's DX13,
 2   DX8 -- I believe it's 385, 390, 397, and then lastly,
 3   DX691, Your Honor.
 4              THE COURT:  So what -- what is it with
 5   respect to those documents?
 6              MR. BROGAN:  Oh, I thought you wanted
 7   us -- I'm sorry.  They were -- the first set was used in
 8   Mr. Arai's deposition, and we just wanted to make sure
 9   they were entered into the record.
10              THE COURT:  Any objection to those?
11              MR. BLACK:  Your Honor, I'll have to
12   check.  I don't have them memorized.  This is -- this is
13   new.
14              THE COURT:  Okay.  Well, you know, I'm
15   going to leave the record open for us to -- for me to
16   consider any written -- the transcripts of the
17   depositions, those portions that were offered into
18   evidence, because it was clear to me that what was said
19   was that counsel was intending to make sure that we knew
20   what exhibits were that were talked about.
21              MR. BLACK:  Yeah.  I -- I --
22              THE COURT:  Okay.
23              MR. BLACK:  -- absolutely agree with
24   that.
25              THE COURT:  I just wanted everybody to
```

1  know that I understand what he's saying and that I --

2  you know, I expect you to make sure to confirm that with

3  your staff, but I want you to know that the Court

4  knows -- has done this on many occasions, should there

5  be an objection, so I'll take it up then.  I'm not

6  suggesting there should be.

7                    MR. BLACK:  Are they in already from --

8                    MR. BROGAN:  I just wanted to make sure

9  they were part of the record.

10                   MR. BLACK:  Well, anything that's

11 preadmitted that's on the admission list --

12                   THE COURT:  Are those on the admission

13 list?

14                   MR. BROGAN:  No.  I think they are on the

15 admission list.

16                   THE COURT:  I've got a list.  Why don't

17 you confirm the list before we take up anything.

18                   All right.  I'll see y'all in about five

19 minutes in -- okay.  Then the offer of proof, what I

20 would propose that we do, the proffer of proof from

21 Mr. Brogan was, while we're making -- after I decide

22 what I'm going to do in the charge, if you'll just stand

23 by, I shouldn't think it would take but just a few

24 minutes, correct?

25                   MR. BROGAN:  Sure.

1          THE COURT:  I'm saying once -- while

2   we're making changes to the charge, maybe we'll come out

3   and do that and get that out of the way, and then that

4   will give you time to collect your thoughts for final

5   argument.

6               Thank you.

7               MR. BROGAN:  Thank you, Your Honor.

8               THE COURT:  All right.  I'll see y'all in

9   just a moment.

10              COURT SECURITY OFFICER:  All rise.

11              (Recess.)

12              COURT SECURITY OFFICER:  All rise.

13              THE COURT:  All right.  Please be seated.

14              All right.  We're going to take up a

15  proffer of proof from Innolux.

16              Mr. Brogan?

17              MR. BROGAN:  Your Honor, we offer this

18  for proof.  We would have demonstrated the Sony DDM

19  Model 2800C from 1989.  With it, we would have used an

20  IBM PS2 Model 55 computer from 1991 and the DDM

21  alignment software DOS version from 1989.

22              Using that equipment, we would have

23  brought the monitor up, showed the jury the display.  We

24  would have had Dr. Rhyne instruct an operator of the

25  system to show that using the keyboard of the computer,

1  you could cause that displayed image to be moved from

2  side to side and then also moved up and down showing

3  that the display would move in position, and then the

4  instruction would have been given to use the keyboard to

5  cause the displayed image to shrink and then expand

6  showing that you could adjust the size of that display

7  as well.

8              And then finally, using the keyboard of

9  the computer, it would have been demonstrated that you

10 could both read data into the memory of the DDM, and

11 then thereafter, using the same keyboard, pull that data

12 back out of the DDM.

13             Thank you, Your Honor.

14             THE COURT:  This was brought to the

15 Court's attention, as I recall, on Wednesday at the time

16 we broke, and I told you I'd give you a ruling on

17 Tuesday on it.  Yeah, Tuesday when we broke, and I

18 indicated I'd give you a ruling orally, which I just had

19 my clerk tell you that I was not going to allow it.  You

20 were not permitted to do it because of that ruling.

21 I'll -- your proffer is received.  I'll be entering a

22 written order giving what I thought about overnight,

23 okay?

24             MR. BROGAN:  Thank you, Your Honor.

25             THE COURT:  All right.  Thank you.

1                    Anything further?

2                    MR. BROGAN:  Not from us, Your Honor.

3                    THE COURT:  All right.  Have I got the

4  right parties here, as far as I want to get something on

5  the record about filing JMOLs in this case as far as

6  timing?

7                    Can y'all deliver it?

8                    MR. BROGAN:  We can deliver the message,

9  Your Honor.

10                    THE COURT:  That's all I want to do.

11                    Okay.  JMOLs, written JMOLs are going to

12  be due ten days from the date of the receipt of the

13  verdict from all parties; the response will be due seven

14  days after that date; and any replies will be five days

15  after that -- after the response.

16                    And the page limits found in the rules on

17  all motions applies to JMOLs.  I want to caution you,

18  because of the Court's recent experience, that agreed

19  orders that usually get done on page limits will be --

20  will not necessarily be granted.

21                    In other words, we had some agreements

22  that slipped by me, and, you know, I had a bunch of

23  75-page JMOLs, and I'm not going to permit that.

24  So if you negotiate an agreement, it should be specific

25  as to the number of pages.  And I'm just forewarning

1  you, we're going to look at it pretty carefully.  You've

2  got to be out -- it got out of hand, and I don't want it

3  to happen again.

4                    Thank you.

5                    So we're going to be -- told the jury to

6  be back at -- I get the Court's charge.  I think we'll

7  have that, let's say, five after 12:00 for objections,

8  okay?

9                    MR. BROGAN:  Thank you, Your Honor.

10                    (Recess.)

11

12                *      *      *      *      *      *

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>CERTIFICATION</u>

        I HEREBY CERTIFY that the foregoing is a
true and correct transcript from the stenographic notes
of the proceedings in the above-entitled matter to the
best of my ability.


/s/_____              _____
SUSAN SIMMONS, CSR                       Date
Official Court Reporter
State of Texas No.:  267
Expiration Date:  12/31/12



/s/_____                  _____
SHELLY HOLMES                            Date
Deputy Official Court Reporter
State of Texas No.:  7804
Expiration Date:  12/31/12